940 So.2d 61 (2006)
STATE of Louisiana, Appellee
v.
Betty Sue JONES, Appellant.
No. 41,449-KA.
Court of Appeal of Louisiana, Second Circuit.
September 20, 2006.
*63 Louisiana Appellate Project by James E. Beal, Jonesboro, for Appellant.
Walter E. May, Jr., District Attorney, Robert A. Moore, Assistant District Attorney, for Appellee.
Before BROWN, CARAWAY and MOORE, JJ.
MOORE, J.
The defendant, Betty Sue Jones, appeals her conviction and 10-year sentence at hard labor for distribution of cocaine in Bienville Parish, Louisiana. We affirm.

FACTS AND PROCEDURAL HISTORY
Because there are issues in this case regarding the timeliness of the prosecution and the division assignment in the Second Judicial District Court, we must detail the procedural record in this case along with the facts underlying the conviction and sentence.
On October 13, 2000, the Bienville Parish Sheriff's Office ("BPSO") conducted an anti-drug operation by using a confidential informant ("CI") wearing a wireless transmitter. The deputies gave the CI $80 to purchase crack cocaine from the defendant in rural Bienville Parish. They recorded the serial numbers before giving the CI the bills. The CI went to the defendant's house where he told the defendant and a male resident of the house, Winthrop Morrison, that he wanted to buy $60[1] worth of crack cocaine. Morrison took $60 from the CI and gave the money to the defendant, who then handed Morrison several rocks of crack. Deputies waiting nearby arrested Morrison and the defendant quickly after the purchase. The defendant was in possession of the "buy" money, but she claimed that the money was the money to pay her light bill. She later made the statement that she had "to find out who set me up."
On December 6, 2000, Bienville Parish District Attorney Walter May filed a bill of information charging Jones with possession of cocaine with the intent to distribute. Although the bill on record does not indicate to which division of the Second Judicial District Court the case was assigned, the parties agree that the case was assigned to Division C.
At the time of the filing of the distribution charge in the instant case, the defendant had a pending hit and run driving charge. According to argument in the trial court, the hit and run case, No. 32,690, was originally assigned to Judge Robert Butler in Division C and prosecuted by then-Assistant District Attorney Glenn Fallin. *64 Fallin succeeded the retiring Judge Butler after a runoff election in April 2000. Because Fallin had served as the prosecutor in No. 32,690 prior to his election, he had to be recused. Judge Jimmy Teat, the judge in Division B, was chosen to preside in No. 32,690 in place of Judge Fallin. Ms. Jones pled guilty in No. 32,690 on October 16, 2000, and was sentenced on September 25, 2001.
In the instant distribution case, the defendant appeared in court without counsel on January 2, 2001. The court appointed counsel from the indigent defender's office on that date (J. Clay Carroll, who was absent; Darrell Avery stood in for Carroll). Jones waived arraignment and pled not guilty. On March 28, 2001, the court granted the state's motion to fix the case for a jury trial on May 21, 2001. The record and the minutes contain no entry for that date; however, on July 16, 2001, the court refixed the case for a trial by jury for September 17, 2001. On August 27, 2001, the court fixed an omnibus hearing for September 7, 2001. The minutes reflect that the defendant was present without counsel.
On September 13, 2001, through newly appointed counsel (Paul Garner) from the indigent defender's office, Jones filed a motion for discovery. On that same date, Jones filed a motion for a continuance; the trial court granted the motion and refixed the trial for November 26, 2001. In the meantime, the state responded to Jones' discovery request.
On November 9, 2001, the defendant was present in court for an omnibus hearing; the defendant declined a plea agreement and the court ordered her to return on November 26, 2001, for a jury trial. Defendant appeared on November 26, 2001, but she was not accompanied by her attorney (Garner). The court ordered the defendant to return with her attorney on November 28, 2001. The defendant and her attorney returned on the appointed date and asked the court to continue the trial until February 19, 2002, a request the court granted.
On February 13, 2002, the defendant appeared with counsel (Garner). Mr. Garner informed the court that he had a conflict for the scheduled trial date. On the defendant's motion, the court continued the trial date yet again, this time until May 20, 2002. The court advised the defendant and her attorney that it would grant no further continuances.
On May 15, 2002, the state filed an amended bill of information. The new bill charged the defendant with distribution of cocaine. That day, the defendant's counsel (Garner) was present in court without the defendant. He informed the court that the defendant wanted to go to trial. The trial date of May 20, 2002, was maintained. On May 16, 2002, the state filed a supplemental discovery response informing the defendant that the informant had been compensated for gas money.
On May 17, 2002, the state filed a motion for a continuance. The basis for the motion was the discovery of additional exculpatory evidence that would be provided on May 19, 2002, after interviews with additional witnesses. The assistant district attorney stated:
[The motion to continue] was based on the fact that two days before the trial we found out information that we did not know previously that we felt was exculpatory and that Mr. Garner was entitled to. . . . If I remember correctly either myself or Mr. May was on the phone with Mr. Garner and explained the situation to him. He said that he would appreciate us filing this continuance because *65 he thought that he might need that evidence.
The D.A. then stated:
Your Honor, I made the call. I was interviewing witnesses and had some . . . good report but I have never personally interviewed some witnesses and I was interviewing some witnesses in preparation for trial like . . . two or three days before trial . . . and got a couple of exculpatory bombshells. . . . I remember that. I remember discussing it with [the assistant district attorney] and I remember calling Mr. Garner. Now the context of the conversation would have been "Mr. Garner, I have just determined that there is exculpatory information that I could not have known about that has just been given to me as a total shock by this witness. I think it would be prudent for us to continue this case so that I can share this exculpatory information with you."
. . .
[I] think when I called Mr. Garner it wasI hung up the phone anticipating that we were going to have a joint motion [to continue] because I was giving, you know, I was like I'm ready to go to trial but I just got some exculpatory information, I'm fixing to give it to you but let's go. And I think he was totally in agreement to continuing the case. I cannot testify to that without some certainty and I think what happened was [that] we just didn't get his on the record participation [sic] in the motion. . . .
The court contacted Mr. Garner and obtained his recollection of the May 2002 motion. Mr. Garner's recollection was recited, second-hand, in open court by counsel for the defendant, James E. Beal:
. . . Mr. Garner's recollection was somewhat inconsistent with Mr. May's in that he indicated that he actually had a call from the Court and not from the District Attorney and that in that telephone call the Court asked him whether he would oppose a continuance by the State, that he indicated that he would like to have a written motion filed by the State, that he would . . . like to know the reason therefor and that he advised [the] Court that he would not require a hearing on it, or oppose it to that extent but that he simply requested that he be furnished a written motion before the Court would consider granting any such continuance by the State and that he did then receive aby faxa written motion containing the allegations of exculpatory evidence obtained by the State which was to be furnished to him by the District Attorney and further indicated that he had not yet received the exculpatory evidence, whatever it is. I believe that is essentially the essence of his statement.
The exculpatory evidence in question was ultimately provided to the defendant's attorney on May 15, 2003. The judge did not remember speaking to Mr. Garner about the matter. In the motion to continue, the prosecutor noted that this was the first request for a continuance made by the state. The judge granted the motion and continued the case without date.
On May 20, 2002, the prosecutor sent a copy of the discovery material in this case to attorney Ricky Swift in Shreveport; the cover letter for the material indicates that this is the material that had been provided to the "previous attorney" in this case. Mr. Swift filed no formal motion to enroll. However, on July 9, 2002, the defendant filed a motion for discovery and production of documents. The motion stated that it was filed by "defendant, through counsel . . ." and was signed by attorney Swift.
On July 22, 2002, Swift wrote the prosecutor *66 a letter[2] informing the state that Swift was not going to file a motion to enroll as counsel because the defendant had not complied with the terms of their contract. In the letter, Swift said that the indigent defender board should continue to represent the defendant.
The record reveals no further activity in this case until March 31, 2003, when the trial court, on the prosecutor's motion, set the case for a jury trial on May 19, 2003. Service information on this order indicates that the order was served on attorney Paul Garner, the defendant's former attorney. On April 25, 2003, the court fixed an omnibus hearing for May 14, 2003. This order was likewise served upon Paul Garner as attorney for the defendant.
On May 14, 2003, the defendant filed a motion to quash the prosecution in this case. Appearing through attorney James Beal from the indigent defender office, the defendant urged that the state had not timely brought the case to trial. The matter was heard by the judge that day. The court concluded that Swift's request for discovery allowed the state until July 2003 to bring the case to trial.
At this same hearing, Jones moved the court to transfer the case from Division C to Division B. As noted, at the time this distribution charge was originally filed, Jones was facing a pending charge of hit and run driving in Bienville Parish. The Uniform Rules of Louisiana District Courts require the allotment of any new felony arrest to the same division where a pending felony is allotted. Judge Fallin denied the motion to transfer, concluding that the hit and run case was assigned to Division C before he was recused and thus was properly a Division C case, even though the judge assigned to Division B actually heard the case.
Jury selection in this case commenced May 19, 2003. The state exercised all 12 of its peremptory challenges; 11 of these challenges were against black jurors. The defendant made a challenge under Batson v. Kentucky, and the trial court found a pattern of strikes against black jurors. Consequently, the trial court required the state to articulate reasons for each of the challenges. Of the eleven peremptory challenges by the state, the defendant complains on appeal about the court's ruling on the following six of these jurors:
Prospective juror Michelle Monroe was a nurse's assistant residing in Arcadia. She was a single mother with two children, ages 17 and 19. Her brother's name was Charles, who formerly worked for the Sheriff's Office. She said that "nothing related to Charles and his former employment or not being employed there would have any affect [sic]" on her ability to sit as a juror.
Prospective juror LaTonya Fitzgerald was an employee of ConAgra in Farmerville and resided in Taylor. She was a single mother with one child, age eight months. She said she knew several sheriff's department deputies, but said this would not affect her verdict. She did not raise her hand when the panel was asked if any had been charged with a "serious crime."
Prospective juror Reginald Haward Shaw was a resident of Bienville Parish and unemployed, single, and one child age 24. He knew the D.A. and the deputies. He had prior jury service in a criminal case where the defendant was acquitted.
Prospective juror Jennifer M. Gray, a resident of Castor, was unemployed, single, with one child, age nine months. She *67 was the first cousin of Bryant Gray, who was then under arrest for first degree murder.
Prospective juror Crystal Lashae Pierce was a resident of Gibsland, employed as counselor at Bernice Community Hospital, and single with one child, age one. She said that she was currently laid off from the hospital for more than a year and was working as a seamstress at West Point Stevens in Coushatta. Her child's father was Marcus Jones, about whom no information was revealed during voir dire. Pierce's responses to questions are often reported as unintelligible and much of the information in the record comes from the repetition of her responses by the questioner.
Prospective juror Chandrica Nicol Jefferson was a resident of Arcadia, employed at McDonald's, and single with one child, age two. The child's father was Carlton Haulcy, whom the D.A.'s office was then pursuing for child support. She said that the child support issue would not cause her problems in being fair and impartial.
For these six jurors, the state's proffered the following reasons for peremptorily challenging them:
Michelle Monroe was the sister of "Charles" who was a former sheriff's employee fired for stealing from the department fine box. The prosecutor expressed concern over Monroe's potentially negative reaction to sheriff's employees to be called as witnesses.
LaTonya Fitzgerald: Per (unrecorded) discussions in chambers, the state had asked that this juror be excused for cause because the juror had four outstanding warrants. The prosecutor learned of this when Bienville Sheriff's deputies in attendance at the trial advised him of that fact, and of the fact that they intended to arrest Fitzgerald as soon as possible while avoiding the disruption of the trial. The prosecutor also noted that the juror did not admit her convictions for illegal possession of stolen things, among others when she was asked.
Reginald Haward Shaw: The prosecutor said that Shaw had twice been a candidate for Bienville Parish Sheriff against the incumbent. The prosecutor said: "[A]lthough it was not one of the most bitter and ugly races I've seen in my life, certainly there was a level of animosity that's not unusual with elections in this part of the country and in this state and my personal knowledge suggests that there is in fact a great deal of resentment that exists between the former candidates for Sheriff that I really can't say spills over into like a deputy or something like that. But it was enough of a concern of mine to cause me to raise a peremptory exception." The prosecutor also noted that Shaw had raised his hand when another panel had been asked if they had been convicted of a crime.
Jennifer M. Gray: The prosecutor said that he struck Ms. Gray because her cousin was currently incarcerated on a charge of first degree murder, and because her cousin lived on the same street as she did, and because that street "is the highest crime area in Bienville Parish."
Crystal Lashae Pierce: The prosecutor noted that this juror was "unbelievably reticent" and gave inconsistent answers to questions about her employment. Further, the father of her child, Marcus Jones, had been convicted of simple burglary in 1999 and may have had a number of other charges against him.
Chandrica Nicol Jefferson: Carlton Haulcy, the father of her child, had an outstanding bench warrant for simple battery. Further, the father lives on a *68 street that the prosecutor described as a high crime area. The court rejected the latter explanation. Although the prosecutor did not cite this as a reason for the challenge, this juror was the recipient of child support, and that fact was discussed during the argument on the peremptory challenge. The prosecutor said:
What I generally do if I have information of this nature, I assumewhen I make a peremptory challenge, if a young lady has a young baby, . . . I place some degree of consideration in the status of the father just simply based on that fact.
Later, after the trial court ruled on this challenge, the prosecutor also said that Ms. Jefferson had waited on him at McDonald's before and "she didn't seem to like me a whole lot."
Throughout the state's explanations, the defendant objected to the prosecutor's references to information outside of that developed on voir dire, an objection that the trial court generally rejected.
As to these six jurors, the court accepted all of the state's explanations as race-neutral, stating:
Now, . . . Ms. Monroe, whose brother was fired by the Bienville Parish Sheriff's Office, I don't know whether that was part of the record or not, but I'm aware of that fact myself so therefore I think that's, I think it's common knowledge among the community that that happened, so that is a non-discriminatory reason that I'm going to find for that one. . . .
As to Fitzgerald, a black female that is pending about having warrants, failure to appear and I'm also aware of that personally, I think that's a non-discriminatory reason. . . .
Mr. Shaw . . . I did notice that Mr. Shaw did raise his hand even though I did not put it on the record or make a notation of the record that when he was asked did anybody haveit was a different panel but he was on the first panel and said did anybody have a previous felony conviction, he did raise his hand. I don't know what reason that was for. He may have been mistaken about something else. But I'm also aware about the Sheriff's race and I think that is common knowledge in the community, too, that he was involved in the previous Sheriff's race. Now whether it was for or against or whatever but I think that's a non-discriminatory challenge. . . .
As to number nine which was Gray first cousin to Bryant Gray who has got a pending first degree murder charge. That's a non-discriminatory reason.
As to Pierceblack female. I couldn't understand what she was saying either but evidently she was having a problem with datelines and had been laid off before from Bernice for a year and a half or two years and I had the impression she was still working for them. Then she said she was a seamstress and the fact about the baby and Marcus Jones, I think that's outside the record, but just by the fact that she can't be consistent answers [sic] about her job and that's a non-discriminatory reason. . . .
Ms. JeffersonMr. May's argument about the charges against the father of her baby. I'm not really concerned about that, that doesn't concern me. The D.A.'s office did say they were getting her support and she said she was satisfied, but for whatever reason I think that is a non-discriminatory reason for the Batson challenge, and I think I'm going to grant, deny the Batson challenge for that because I think he does have a non-discriminatory reason *69 by the fact that he is getting her support whether it's good or bad or whatever.
Notably, the trial court sustained the defendant's Batson challenge as to two other jurors and put those jurors back on the panel. The jury was ultimately comprised of seven white males, two white females, three black males and one black female. Both of the alternate jurors were black females
At the conclusion of trial, the jury voted to convict Ms. Jones as charged. On June 17, 2003, attorney Peter Flowers enrolled on behalf of Ms. Jones and filed a motion for discovery. The court sentenced Ms. Jones on June 18, 2003. The court observed:
[C]onsidering the evidence pursuant to the trial this was not a one-time distribution but a situation where several people were waiting for you to come back after obtaining an amount of cocaine to sell the cocaine to them. And also from the previous omnibus hearings it's my understanding that you had three outstanding distribution of cocaine charges still pending. . . .
The court sentenced Ms. Jones to serve 10 years imprisonment with the Department of Corrections to run consecutive to the sentence for her previous hit and run driving conviction.
On July 9, 2003, Ms. Jones, through counsel, filed a motion to extend the filing date for a motion to reconsider sentence. The motion asked the court to extend the date to "thirty days after the preparation and filing of the transcript in this case." The court granted this motion.
Apparently there was some confusion about the completion of the transcript, and the record was not completed for Ms. Jones' new attorney for some time. On September 23, 2004, Jones' attorney (Flowers) wrote a letter to the court stating that the transcript had still not been provided. Included with the letter was a motion to reconsider sentence. The motion to reconsider stated that the defendant was 53 years old and in such poor health that she was sometimes unable to speak to her attorney on the phone. The motion also urged that the prosecution of Ms. Jones was untimely; the accompanying memo in support primarily argued the timeliness issue. The trial court set the matter for a hearing on November 9, 2004. That hearing was rescheduled for February 9, 2005. The defendant and her attorney were not present on that date; the court denied the motion to reconsider. Notice of that ruling was mailed by the district court clerk to the defendant, but the notice sent to the defendant personally was returned by the post office with the notation "attempted not known."
On May 9, 2005, this court wrote a letter to Ms. Jones informing her that this court had no record of an appeal from her conviction in the instant case, Second JDC No. 35,032. Attached was another letter from this court to Ms. Jones dated March 30, 2005, informing her that no appeal had been taken in this case as of that date. Also filed in the record is a motion filed pro se in the district court by Ms. Jones in October 2003, asking the court for, inter alia, a copy of the transcript.
The court denied this motion with a notation stating, in part, that the case was "presently under appeal in which she has an attorney. . . ."
In September 2005, Ms. Jones filed a motion pro se in the district court asking for a rehearing of her motion to reconsider because she had not been able to be present at the hearing. The trial court set that motion for a hearing on November 8, 2005. The court also allowed Ms. Jones to proceed as a pauper. On November 8, Ms. Jones was present in court without *70 counsel; the court reset the hearing for December 7, 2005. When neither the defendant nor any attorney appeared on that date, the court reset the hearing for January 11, 2006. On that date, the defendant was present in court, and the judge appointed her an attorney (James Beal) who verbally moved the court for an appeal, which the court granted.

DISCUSSION
Initially, we observe that there is a question about the timeliness of this appeal. La. C. Cr. P. art. 914 provides:
A. A motion for an appeal may be made orally in open court or by filing a written motion with the clerk. The motion shall be entered in the minutes of the court.
B. The motion for an appeal must be made no later than:
(1) Thirty days after the rendition of the judgment or ruling from which the appeal is taken.
(2) Thirty days from the ruling on a motion to reconsider sentence filed pursuant to Article 881.1, should such a motion be filed.
The trial court ruled on Jones' motion to reconsider sentence on February 9, 2005, and her motion for appeal was not filed until January 11, 2006, long after the 30-day period for appealing had expired. Moreover, La. C. Cr. P. art. 881.1(A)(1) provides:
A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
(Emphasis added.) The defendant's attorney did not request a longer time for filing the motion to reconsider at sentence; the motion to extend the time for filing was filed after the June 2003 sentencing. Compare State v. Neville, 95-0547 (La. App. 4 Cir. 5/16/95), 655 So.2d 785, writ denied, 95-1521 (La.9/29/95), 660 So.2d 851, where the fourth circuit rejected a late extension of time for filing a motion to reconsider.
In this case, however, there is evidence that the defendant wanted to appeal her conviction prior to the expiration of two years from the time her conviction and sentence would have become final even if one does not consider the late motion to reconsider sentence. Thus, the appeal would likely be timely as post-conviction relief under La. C. Cr. P. art. 930.8. Ms. Jones' inquiries about an appeal with this court came in March and May[3] of 2005; her sentence was imposed in June 2003. Further, the trial court allowed the filing and late consideration of the motion to reconsider sentence. The state has not objected to the timeliness of this appeal.
Accordingly, we will review the case.

Assignment of Error 1: The District Court erred in denying defendant's motion to transfer this case to Division B, in violation of Local Court Rules and the due process requirements of State v. Simpson.

The defendant urges that the district court should have assigned this case to Division B after Judge Fallin was recused from Ms. Jones' pending prosecution for hit and run driving and Judge Teat from Division B was appointed to hear that case. The defendant cites State v. Simpson, 551 So.2d 1303 (La.1989), as authority that the allegedly non-random assignment of this case to Division C rather than Division B violates her right to due process. In Simpson, the supreme court *71 concluded that allowing the D.A. to decide the assignment of cases violated the due process rights of the accused. Defendant also cites Rule 14.1 of the Louisiana District Court Rules, which provides:
(a) Unless a different method is set forth in Appendix 13, if a defendant has a felony case pending and previously allotted, any new felony arrest for that defendant shall be allotted to the division to which the pending felony was allotted. This felonies-following-felonies rule also applies to any pending felony arrests for a co-defendant with a new arrest and billed as a co-defendant.
(b) For purposes of this rule, a felony case remains pending until any of the following events has occurred:
(1) the statute of limitations runs;
(2) a change of booking is made, reducing the case to a misdemeanor;
(3) a bill of information or indictment is filed or amended, reducing the case to a misdemeanor;
(4) the District Attorney's office enters a nolle prosequi in a case; or
(5) a finding of guilt (with sentence having been imposed), not guilty, or not guilty by reason of insanity is entered on the record.
Appendix 13 to this rule provides, in part:
Second Judicial District Court
Bienville, Claiborne, and Jackson Parishes
Defendant with pending felony prosecution and charged with another shall be assigned to division first charges assigned to.
Multiple offenses on different dates the earliest occurrence date shall control permanent assignment of case.
There is no evidence in this record showing the division of the Second Judicial District Court that was assigned the hit and run case. The record from that case is not a part of this record nor were the minutes proffered in furtherance of the motion to transfer the case. However, counsel and the trial court apparently agree that the casethe first filed between these two prosecutionswas initially assigned to Division C. Only after its assignment to that division was Judge Fallin recused and the case assigned to Judge Teat. Judge Teat is normally a Division B judge, but there is no evidence in the record that the hit and run case was formally assigned to Division B.
La. C. Cr. P. art. 676 provides, in part:
A. When a district court judge, or a judge of a separate juvenile court or of a family court, recuses himself, a judge ad hoc shall be assigned to try the case in the manner provided by Article 675 for the appointment of a judge ad hoc to try a motion to recuse.
La. C. Cr. P. art. 675 provides, in part:
B. In a court having more than two judges, the motion to recuse shall be referred to another judge of the court through a random process as provided by the rules of court.
In Appendix 11 to Rule 14.0 of the Louisiana District Court Rules (Allotment of Cases), the Second JDC does not have a rule governing the allotment of a case where the assigned judge is recused; other courts in this circuit (for example, the First, Fourth and Twenty-Sixth JDCs) do have such rules. The rule in the Twenty-Sixth JDC is:
In the event a Judge recuses himself from a particular case, the case shall be allotted at random to another Division and the recused Judge shall be assigned an additional case of equal class to offset such loss.
The rule in the Second JDC does not explicitly specify that the case is allotted to another Division because of the recusal. *72 Because of the aforementioned lack of any filings from the hit and run case, we cannot determine from the record that it was actually allotted to Division B despite the recusal. The state argues that the recusal of a judge does not automatically effect a legal transfer of the matter from one division to another, but rather that the judge to whom the case is transferred now sits as a judge of the division in which the case is pending.
In the absence of evidence or a court rule showing otherwise, we conclude that the defendant has shown no prejudice from the process by which this case was allotted to Judge Fallin. Moreover, there is no indication that the defendant's due process rights were violated by the process. In this instance, the prosecutor did not choose the division of court as in Simpson, supra, and this case was assigned to Division C by random allotment because the first-filed hit and run charge was assigned to that division.
This assignment of error is without merit.
Assignment of Error 2: The District Court erred in denying defendant's motion to quash the bill of information in this matter for failure to timely prosecute.
The prosecution was instituted in this case on December 6, 2000, when the district attorney filed a bill of information against the defendant. The case was not tried, however, until May 19, 2003. During the interim, trial was initially scheduled for May 21, 2001, then reset for September 17, 2001, and then upset and continued by defendant's motion to November 26, 2001. On the scheduled day for trial, defendant appeared without her attorney. The court ordered her to appear with her attorney for trial on November 28; on that date, counsel moved for a continuance. The motion was granted and trial was reset for February 19, 2002. A week before trial at an omnibus hearing on February 13, 2002, counsel for the defendant disclosed that he had a conflict of trial settings on February 19, 2002, and he requested that the trial date be refixed for May 20, 2002.
At the hearing on defendant's motion to quash, the D.A. told the court that a few days prior to the trial scheduled for May 20, he discovered evidence favorable to the defendant while interviewing witnesses. District attorney May further stated that he telephoned Mr. Garner, counsel for the defendant, regarding the evidence and suggested that they continue the trial. May was confident in his memory of the conversation, and he told the court he believed that the state and defense counsel would be filing a joint motion. However, the motion was filed solely by the state on May 17, 2002.
Interested in determining whether the defense had acquiesced in the motion to continue, the court contacted Mr. Garner by telephone in the presence of the prosecutor and defense counsel Beal. After the telephone interview, the parties stipulated that Mr. Garner recalled that it was not the D.A., but the court who telephoned him regarding the continuance and asked if he would oppose a motion to continue by the state. It appears that he did not express opposition to the continuance, but did state that he would like to know the reasons and have a written copy of the motion before the court ruled on it. He stated that he received a fax of the motion for continuance on the grounds of newly discovered exculpatory evidence, but he never received the exculpatory evidence. On the other hand, the record contains the assistant D.A.'s letter dated May 16, 2002 to Mr. Garner with accompanying amended and supplemental discovery responses filed in the record that day. The material included exculpatory evidence, that is, that *73 the CI received payment in the form of gas money, and an inculpatory statement by the defendant in which she said she was set up.
Defendant also apparently retained new counsel, attorney Ricky Swift, at or shortly before the May 20, 2002 scheduled trial. This is apparent because the record contains a letter to Swift dated May 20, 2002 from the D.A.'s office from Ms. Jump, an assistant D.A., containing all discovery material provided to defendant's former counsel. Although he never filed a formal motion to enroll, Swift had apparently already contacted the D.A. regarding his representation. He filed a motion for discovery on July 9, 2002, as counsel for the defendant. However, on July 22, 2002, Swift sent the assistant D.A. a letter stating that he would not be filing a motion to enroll as counsel for the defendant and that his representation had been terminated.
The state did not move to set a trial date until April 1, 2003, when trial was scheduled for May 19, 2003. Defense counsel filed a motion to quash on May 14, 2003. The motion was heard on that day. The trial court denied the motion to quash, stating that it would have granted the motion except for the motion (for discovery) filed by Ricky Swift.
Defendant contends on appeal that the state had no later than February 19, 2003 to bring the matter to trial, that is, a year from the date that the defendant's last motion for continuance was ruled upon. She contends that attorney Ricky Swift's motion for discovery should have no effect because he was never enrolled as counsel of record, and, secondly, the discovery materials that he requested were provided to him before he filed the motion, thus rendering the formal motion superfluous and in no way tending to delay the prosecution.
The following statutes are relevant to our analysis:
La. C. Cr. P. art. 578 provides, in part:
Except as otherwise provided in this Chapter, no trial shall be commenced:
. . .
(2) In other felony cases after two years from the date of institution of the prosecution. . . .
The offense charged shall determine the applicable limitation.
La. C. Cr. P. art. 580 provides:
When a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but in no case shall the state have less than one year after the ruling to commence the trial.
La. C. Cr. P. art. 581 provides:
Upon the expiration of the limitations established by this Chapter, the court shall, upon motion of the defendant, dismiss the indictment. This right of dismissal is waived unless the motion to quash is made prior to trial.
If the indictment is dismissed under this article, there shall be no further prosecution against the defendant for the same or a lesser offense based on the same facts.
For purposes of Art. 580, a preliminary plea is any pleading or motion filed by the defense which has the effect of delaying trial. State v. Brooks, XXXX-XXXX (La.2/14/03), 838 So.2d 778. These pleadings include properly filed motions to quash, motions to suppress, or motions for a continuance, as well as applications for discovery and bills of particulars. Id. Joint motions for a continuance fall under the same rule. Id. The delays occasioned by a defendant's efforts to *74 secure counsel do not invariably constitute grounds for suspension of the time limits for trial specified by Art. 578 when they have not "affected the state's efforts to prosecute in any respect." Brooks, supra, citing State v. Carr, 271 So.2d 871, 872 (La.1973).
Once the accused shows that the state has failed to bring him to trial within the time periods specified by Art. 578, the state bears a heavy burden of demonstrating that either an interruption or a suspension of the time limit tolled prescription. State v. Morris, 99-3235 (La.2/18/00), 755 So.2d 205. However, when a trial judge denies a motion to quash, that decision should not be reversed in the absence of a clear abuse of the trial court's discretion. State v. Love, 00-3347 (La.5/23/03), 847 So.2d 1198, 1208.
Irrespective of whether Mr. Swift enrolled as counsel of record, it is clear that he was acting on the defendant's behalf as her attorney when he filed the motion for discovery. The record is not clear whether defendant had retained Swift as additional counsel or new counsel. The record does not show that defendant's indigent defender counsel had filed any motion to withdraw. The testimony of the D.A. and the fact that the assistant district attorney sent Swift the discovery materials indicate that although he had not formally enrolled as (additional) counsel of record, they believed he was representing the defendant. In State Through Dept. of Highways v. Jackson, 211 So.2d 93 (La.App. 1 Cir. 1968), a civil case involving the question of abandonment of an action, the court noted that "[t]he enrollment of additional counsel in a pending case merely informs the court, its officers and all parties that he has been so employed or retained by the client, in addition to prior counsel of record, with the implied authority to also perform all acts necessary or incidental to the prosecution . . . of his client's case." We conclude that the fact that Mr. Swift was not formally enrolled as counsel of record does not affect the existence or validity of the motion for discovery where the D.A. was notified by Mr. Swift and reasonably believed that Mr. Swift was acting on his client's behalf.
The more interesting question is whether the motion for discovery filed by Swift on July 9, 2002 constituted a preliminary plea that had the effect of suspending prescription where the discovery materials were in fact provided to Swift before he filed the motion for discovery and no ruling was required. As noted above, a preliminary plea for purposes of Art. 580 is any pleading or motion filed by the defense which has the effect of delaying trial, including applications or motions for discovery. State v. Brooks, XXXX-XXXX (La.2/14/03), 838 So.2d 778. The defendant contends that because Swift's motion did not require any ruling, it did not have the effect of delaying trial, and therefore, it should not have triggered the one-year rule in Art. 580.
We disagree. By filing the motion for discovery, at the very least, the state is required to review the motion and determine if it must comply with the discovery request. Moreover, it is the filing of the preliminary plea, such as a motion for discovery, that triggers the suspension of the prescriptive period. The suspension lasts until the motion is ruled upon, but in no event does the state have less than one year from the ruling to commence trial. La. C. Cr. P. art. 580. In this instance, there was no ruling required and Swift subsequently informed the D.A. he would not be enrolling as counsel of record. We conclude, however, that the filing did trigger the one-year period provided by Art. 580.
*75 We observe that in civil cases, any formal discovery served on the parties whether or not filed in the record is deemed a step in the prosecution or defense of an action that interrupts prescription for purposes of abandonment of actions. La. C.C.P. art. 561(B). However the analogy with La. C. Cr. P. art. 578 is imperfect inasmuch as the right to a speedy trial in a criminal prosecution is a constitutionally protected right emanating from the Sixth Amendment, whereas La. C.C.P. art. 561 is designed to protect a claimant's right to obtain a remedy as well as a defendant's right to have a claim resolved within a reasonable time.
After reviewing all the evidence in the record, we conclude that the trial court did not abuse its discretion in denying the motion to quash. Even though the motion for discovery filed by Swift did not require a ruling from the court, it triggered the provision of Art. 580 that gave the state one year from filing on July 9, 2002 to bring the matter to trial. Based upon our review of the arguments and evidence presented at the hearing on the motion to quash, it is apparent that the court believed that Ricky Swift's short and limited involvement in the case triggered a delay in the prosecution of this case that was sufficient to implicate La. C. Cr. P. art. 580. We will not disturb this ruling, as we find no abuse of the trial court's vast discretion.
Assignment of Error 3: The District Court erred in allowing the District Attorney to use evidence not in the record to support peremptory challenges of jurors when a racial pattern of challenges had been established pursuant to Batson v. Kentucky.
In this assignment of error, the defendant argues that the trial court erred in the third step of the Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) analysis by considering that portion of the state's proffered reasons that reflected matters outside of those developed on voir dire.
In State v. Harris, XXXX-XXXX (La.6/21/02), 820 So.2d 471, the supreme court explained the Batson process:
Both in this state and throughout the nation, the law is firmly settled that peremptory strikes may not be based on race in either criminal or civil cases. La. C. Cr. P. art. 795(c). If it appears that one party is using its peremptory strikes in a discriminatory manner, the other party may raise the issue by making what has come to be known as a Batson objection. In several assignments of error, the defendant argues that the state exercised its peremptory challenges in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
In Batson v. Kentucky, supra, the United States Supreme Court held that the Equal Protection Clause forbids the use of peremptory strikes to challenge potential jurors solely on account of their race or the assumption that members of a certain race will be unable to impartially consider the case before them. The Court concluded that such discriminatory practices in the use of peremptory challenges denies a defendant equal protection of the law and unconstitutionally discriminates against the potential juror in violation of the Fourteenth Amendment. Id. at 84-89, 106 S.Ct. at 1716-19.
To assure such discrimination does not occur, the Court, in Batson, established a three-part framework to be employed in evaluating an equal protection challenge to a prosecutor's use of a peremptory strike. First, the defendant must make a prima facie showing of discrimination *76 in the prosecutor's use of the strike. If he fulfills this requirement, then the prosecutor must offer a race-neutral explanation for the challenge. This is a burden of production, not one of persuasion. Then, the trial court must decide whether the defendant has carried the ultimate burden of proving that the strike constituted purposeful discrimination on the basis of race.
(Citations omitted.) In State v. Qualls, 40,630 (La.App. 2 Cir. 1/27/06), 921 So.2d 226, this court explained the third step of the trial court's analysis:
If the state tenders a race-neutral explanation, then the trial court must decide, in the final step of this three-part analysis, whether the defendant has established purposeful racial discrimination. To be facially valid, the prosecutor's explanation need not be persuasive or even plausible. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. The proper inquiry, in this, the final step of the Batson analysis, is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral explanations, is sufficient to persuade the trial court that discriminatory intent is present. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge.
The ultimate focus of the Batson inquiry is on the prosecutor's intent at the time of the strike. In resolving the ultimate inquiry before itwhether the proffered race-neutral explanation should be believedthe trial court should examine all of the evidence available. Patterns of strikes and other statements or actions by the prosecutor during voir dire are relevant and may support a finding of discriminatory intent.
The trial court is in a position to observe firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. As a result, a trial judge's determination on a claim of purposeful discrimination rests largely on credibility evaluations, and the trial court's findings as to purposeful discriminatory intent are entitled to great deference by reviewing courts.
(Citations omitted.) As this court observed in State v. Johnson, 621 So.2d 1167 (La.App. 2 Cir.1993), writ denied, 626 So.2d 1178 (La.10/29/93):
A trial court's decision on the issue of a prosecutor's intent is to be afforded great deference on appeal. Batson treats intent to discriminate as an issue of fact which largely turns on an evaluation of the credibility of the prosecutor. Certainly a trial judge who observed the questioning of the prospective jurors is in the best position to discern the truthfulness of the prosecutor's explanation. Thus, we decline to overturn a trial court's finding on the issue of discriminatory intent unless convinced that its decision was clearly wrong or manifestly erroneous.
The trial court concluded that the defendant had made a prima facie showing of racial discrimination because the prosecutor exercised 11 of its 12 peremptory challenges against black jurors. Thereafter, the state offered reasons for these challenges. The trial court rejected two of these explanations and correctly re-empaneled the improperly stricken jurors. However, the court accepted the state's explanations as to the other jurors. As noted, some of the prosecutor's proffered reasons referred to matters that were not explored during voir dire. The defendant argues *77 that the trial court should not have allowed the prosecutor to refer to matters outside of those explored during voir dire.
That question appears not to have been addressed in a published Louisiana opinion, but the Supreme Court of Mississippi recently faced the issue in Brawner v. State, 872 So.2d 1 (Miss.2004), at 11-12:
While we do not hold today that our trial judges should conduct a "mini-hearing" within a Batson hearing each time a peremptory challenge is exercised based on information gained from outside sources, we do depend on the trial courts to exercise caution to ensure that peremptory challenges based on information from outside sources is credible and supported by on-the-record factual findings to this effect and that a complete record is made on this issue. If in doubt about the validity of outside information, the trial court should do what is necessary to ensure the proposed reasons are non-pretextual. This may include questioning the outside source on the record.
See also Ex Parte Johnson, 823 So.2d 57 (Ala.2001), cert. denied sub nom Johnson v. Alabama, 535 U.S. 1085, 122 S.Ct. 1978, 152 L.Ed.2d 1035 (2002):
The duty is on the State to establish its race-neutral reasons. The State is commonly allowed to establish them on the basis of matters that are entirely outside the record, such as recollections of the prosecutor about some prior criminal activity or prosecution of a prospective juror.
Further, see Commonwealth v. Snodgrass, 831 S.W.2d 176 (Ky.1992), where the Kentucky Supreme Court said (at 179):
A prosecutor may utilize his own personal knowledge concerning a juror and information supplied from outside sources. Whether the information is true or false is not the test. The test is whether the prosecutor has a good-faith belief in the information and whether he can articulate the reason to the trial court in a race-neutral manner which is not inviolate of the defendant's constitutional rights.
In the instant case, the court was personally familiar with the cited reasons for prospective jurors Monroe, Fitzgerald and Shaw. The prosecutor's reasons for challenging those individuals were race-neutral and the trial court accepted those reasons based on its knowledge of the facts concerning them. There is no clear error as to any of those rulings. It is not clear from the record that the court knew of the situation with Gray's cousin, although in the Second Judicial District Court, it is likely that the judge was aware of that situation. The court accepted the state's reason without further challenge, and that ruling is not clearly wrong.
Even from the cold record it is apparent that prospective juror Pierce was difficult to understand and only reluctantly gave answers to questions; moreover, those answers were sometimes inconsistent and contradictory. The trial court's ruling is supported by the record. Finally, as to Ms. Jefferson, the child support issue relied upon by the trial court was not a part of the prosecutor's initial reasons for challenging this person but later discussion confirmed that this was a part of the prosecutor's reticence about her. The fact that the D.A.'s office was pursuing Ms. Jefferson's boyfriend for child support is a race-neutral reason for a peremptory challenge[4], is supported by facts in the record developed during voir dire and the trial court accepted the reason as race neutral. *78 That finding is not clearly wrong given the vagaries of credibility that play an important role in the decision regarding Batson challenges.
This assignment of error is without merit.
Assignment of Error 4: The sentence imposed on this first offender was excessive and not supported by the record.
On October 13, 2000, the date of this offense, La. R.S. 40:967(B)(4)(b) provided:
(b) Distribution, dispensing, or possession with intent to produce, manufacture, distribute or dispense cocaine or cocaine base or a mixture or substance containing cocaine or its analogues as provided in Schedule II(A)(4) of R.S. 40:964 shall be sentenced to a term of imprisonment at hard labor for not less than five years nor more than thirty years, with the first five years of said sentence being without benefit of parole, probation, or suspension of sentence; and may, in addition, be sentenced to pay a fine of not more than fifty thousand dollars.
The trial court sentenced Ms. Jones to ten years' imprisonment with the Department of Corrections, but did not impose the first five years of the sentence without parole[5]. However, this omission is cured by the operation of La. R.S. 15:301.1, and requires no correction on appeal. The trial court elected not to impose the optional fine.
The defendant did not request at sentencing any additional time for the filing of a motion to reconsider sentence; she filed the motion for additional time after sentencing. La. C. Cr. P. art. 881.1(A)(1) provides:
A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
In State v. Neville, XXXX-XXXX (La.App. 4 Cir. 5/16/95), 655 So.2d 785, writ denied, XXXX-XXXX (La.9/29/95), 660 So.2d 851[6], the fourth circuit concluded that a trial court could not reconsider a defendant's sentence in reaction to a motion to reconsider filed 15 months after sentencing where the transcript of the sentencing hearing did not reflect that the time for filing the motion to reconsider was extended at sentencing. The appellate court noted that the minutes of court from the time of sentencing reflected a statement by the trial court of a conversation in chambers with the defense attorney allowing the filing of such a motion within 18 months, but the court relied in part on the absence of that information from the transcript to find that the trial court had no authority to reconsider the defendant's sentence. In Neville, additionally, the defendant had begun serving his sentence at the time the trial court modified the sentence; the appellate court held that to be impermissible.
In this case, the motion for extension of time was not filed "at sentencing" but was filed in the record after sentencing, and the motion was granted by the trial judge on the record. We conclude that the trial court had no authority to reconsider the sentence.
When a defendant fails to timely file a motion to reconsider sentence, the appellate court's review is limited to the bare claim that the sentence is constitutionally *79 excessive. State v. Mims, 619 So.2d 1059 (La.1993); State v. Duncan, 30,453 (La.App. 2 Cir. 2/25/98), 707 So.2d 164. The trial court did not comply with La. C. Cr. P. art. 894.1, but in the absence of a timely motion to reconsider sentence, the defendant cannot avail herself of that omission. Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Lobato, 603 So.2d 739 (La.1992); State v. White, 37,815 (La.App. 2 Cir. 12/17/03), 862 So.2d 1123. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App. 2 Cir. 04/02/97), 691 So.2d 864.
A trial court has broad discretion to sentence within the statutory limits. State v. Black, 28,100 (La.App. 2 Cir. 02/28/96), 669 So.2d 667, writ denied, 96-0836 (La.09/20/96), 679 So.2d 430. Absent a showing of manifest abuse of that discretion, a reviewing court may not set aside a sentence. State v. Guzman, 99-1753 (La.05/16/00), 769 So.2d 1158. Clearly this defendant's less-than-midrange sentence without a fine is not constitutionally excessive even for a first offender. The minimum sentence for distribution of cocaine at the time was five years without benefits; the defendant's sentence of one-third of the maximum hardly shocks the conscience.
Accordingly, this assignment is without merit.

CONCLUSION
For the reasons stated above, the conviction and sentence of the defendant are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The informant kept $20 of the money for gas money.
[2] The letter was not filed in the record at the time of writing but was admitted as evidence for purposes of the hearing on the motion to quash.
[3] This one was forwarded by this court to the trial court.
[4] Ms. Pierce said that the support issue would not impact her ability to be a juror, so the prosecutor likely believed that a challenge for cause would be futile.
[5] Because the trial court sentenced the defendant to imprisonment, the sentence was not suspended nor was the defendant placed on probation.
[6] See also State v. Temple, 2000-2183 (La. App. 4 Cir. 5/16/01), 789 So.2d 639.