968 So.2d 1135 (2007)
STATE of Louisiana, Appellee
v.
Tremaine TAYLOR, Appellant.
No. 42,627-KA.
Court of Appeal of Louisiana, Second Circuit.
October 24, 2007.
*1139 Louis G. Scott, for Appellant.
Jerry L. Jones, District Attorney, J. Michael Ruddick, Assistant District Attorney, for Appellee.
Before BROWN, CARAWAY & PEATROSS, JJ.
PEATROSS, J.
Defendant, Tremaine Taylor, was convicted by a jury of attempted second degree murder, armed robbery and two counts of carjacking. In regard to attempted second degree murder, the trial court sentenced Defendant to 45 years at hard labor without benefit of parole, probation or suspension of sentence. In regard to armed robbery, the trial court sentenced Defendant to 70 years at hard labor without benefit of parole, probation or suspension of sentence. In regard to both counts of carjacking, the trial court sentenced Defendant to 20 years at hard labor without benefit of parole, probation or suspension of sentence and ordered that the carjacking sentences be served concurrently. The trial court ordered that the sentences for attempted second degree murder and armed robbery be served concurrently to each other and consecutively to the sentences for carjacking, with credit for time served. Defendant now appeals. For the reasons stated herein, the convictions and sentences of Defendant are affirmed.

FACTS
On March 2, 2003, Willie Lamar Reed was walking home from a friend's house on Luther Street in Monroe when Defendant approached him and asked for a cigarette. When Reed told Defendant that he did not have enough cigarettes to give him one, Defendant grabbed Reed by the throat. Reed jerked away from Defendant and, at the same time, saw something shiny coming up toward him. Suddenly, Reed saw a flash and felt a gunfire blast go within two to three inches of his face; Reed testified that fragments from the blast actually hit his face. Reed ran to a neighbor's house and called the police. Reed went back outside and saw Defendant, who then said, "Mot Reed, I see you, bitch." Defendant then fired another shot at Reed, and Reed ran back inside the house. Reed testified that he could see Defendant walking down the sidewalk, that Defendant was continuing to discharge the firearm and that Defendant took a car from someone in a nearby driveway while still armed with the handgun. He further testified that, when he saw the police arrive, he told them what happened, including the facts that there was no argument between him and Defendant and that Defendant had no reason for doing what he did. Reed maintained that he believed Defendant would have shot him in the forehead if he had not jerked back.
Donnie McGee testified that he was visiting a friend on Luther Street that night and that he thought he heard gunshots as he got out of his car. McGee testified that he went inside and continued hearing gunshots, but that he went back outside because he remembered leaving his keys inside the car. While standing outside next to his 1996 Buick Century and talking to his friend, Defendant walked up and got inside of McGee's car. McGee told Defendant to get out of his car, but Defendant started the engine. McGee reached inside the car to retrieve the keys and try to get Defendant out of his car, but Defendant then pointed a gun at his chest. McGee backed away, and Defendant drove away. McGee testified that he did not give Defendant permission to take his car.
Soon thereafter, Vincent J. Newton, Jr., was driving his 1999 Lincoln Navigator on *1140 Jackson Street when he encountered Defendant. Newton noticed Defendant because he thought Defendant was driving "crazy" and following him as Newton took a friend to her home on Mississippi Street. Newton saw Defendant pull into a nearby driveway and, after the friend got out of his vehicle, Defendant knocked on Newton's window and pulled open the car door. Newton saw that Defendant had a silver gun pointed at him, and Defendant told Newton to give up the truck. Defendant then made Newton give him all of his valuables, which included a ring, a cell phone and some loose cash. Defendant drove away in Newton's Lincoln Navigator, and Newton then flagged down a Monroe Police patrol car that was passing by at the time.
Monroe Police Officers Roy Cox and Tommy Crowson approached Defendant inside the Winnsboro Grocery and Gas because he matched the description issued in a BOLO ("Be On The Lookout"). Defendant initially refused their request to step outside, so they handcuffed him and forcefully took him outside. When searching Defendant's person, they found a cell phone and a ring. The Lincoln Navigator was in the parking lot with a silver and black 9mm Smith and Wesson handgun inside. Monroe Police Office Lisa Quillar drove Newton to Winnsboro Grocery and Gas, where Newton identified the vehicle, ring and cell phone as being his. In the meantime, bullet casings were recovered from the crime scenes at Luther Street, which were sent to the North Louisiana Crime Laboratory for analysis. Michael Stelly, an expert in firearms identification with the North Louisiana Crime Laboratory, testified that the bullet cartridges recovered from the crime scene on Luther Street were fired from the handgun recovered at Winnsboro Grocery and Gas. Monroe Police Officer Roderick Jackson, who was the detective on the case, testified that the crime scenes on Luther Street were approximately four miles from the Winnsboro Grocery and Gas.
During opening and closing statements at trial, counsel for Defendant did not dispute the State's assertion of what Defendant did on March 2, 2003; however, he argued that Defendant was not responsible for his actions because, earlier in the day, he had been smoking a marijuana cigarette that was, unbeknownst to him, laced with phencyclidine ("PCP"), which caused him to commit those crimes. Officer Jackson testified that Defendant was eventually taken to the hospital for evaluation because he was behaving in a strange manner and throwing things at the Monroe Police Department. Medical records from the hospital indicated that a toxicology test was performed on Defendant's urine and that it tested positive for PCP and marijuana. In support of his claim that he involuntarily ingested the PCP, Defendant presented the testimony of Clyde Bernard Mitchell. Mitchell, who was incarcerated at the time of trial, testified that he is Defendant's friend and that he was at a barbeque with Defendant on that day. He further explained that he gave Defendant a marijuana cigarette laced with PCP while Defendant was cooking. Mitchell testified that he did not tell Defendant about the PCP and that he did not know it would affect him that way.
On cross-examination, Mitchell testified that he and others smoked this same cigarette, but that neither he nor anyone else who had smoked that cigarette tried to kill, rob or carjack anyone else that day. When asked why he did not give this information to police earlier, Mitchell testified that he did not want to get a reputation for being a "rat" by talking to police. Warren Brown, an investigator with the District Attorney's office, testified that he interviewed Mitchell before the trial and *1141 that Mitchell told him that Defendant and everyone at the barbeque knew that the marijuana cigarette was laced with PCP.
As previously stated, based upon the evidence at trial, the jury convicted Defendant of attempted second degree murder, armed robbery and two counts of carjacking.

DISCUSSION
Assignment of Error Number One (verbatim): The trial court erred by excluding the testimony of Dr. Donald Harvey Marks.
Defendant argues that the trial court erred in excluding the expert testimony of Dr. Donald Harvey Marks because his testimony was admissible under La. C.E. art. 702 in that it was necessary to help the jury understand that his actions were indicative of drug intoxication. Defendant argues that this expert testimony was necessary to prove his lack of specific intent, which was an element of the offenses charged. Defendant also argued that, because the State argued that Defendant was not very intoxicated and that the PCP did not affect others the way it affected him, the testimony of Dr. Marks was necessary to show the jury how drugs affect different people in different ways. As a result, Defendant argues that the jury may not have believed that he was intoxicated at the time of the offenses. Defendant argues that Dr. Marks had excellent credentials, which included having both an M.D. and a Ph.D., being the associate director of research at Hoffman LaRoche Pharmaceutical, being the associate director of research at Aventis Pasteur Pharmaceuticals, being board-certified in internal medicine, having medical licenses in three states and being both a physician researcher and practicing physician at a hospital. Defendant argues that less qualified individuals, such as laymen, crime laboratory employees and law enforcement officers, have been permitted to testify about intoxication. Defendant further asserts that the Daubert standards do not apply to all cases requiring expert testimony. In addition, Defendant argues that the trial court erred in excluding the testimony on the ground that it would be based upon hearsay because experts are allowed to use hearsay information and because the State would have had the opportunity to cross-examine Dr. Marks. According to Defendant, the trial court should not have excluded the testimony, but, rather, allowed the jury to determine what weight should be given to it.
The State argues that the trial court did not commit manifest error by excluding Dr. Marks as an expert witness on the adverse effects of PCP. In support thereof, the State emphasizes that Dr. Marks' experience was limited to two cases that he treated 15 years ago, where he received information from police that the patients were on PCP and where he could not clearly recall if the PCP intoxication had been confirmed by medical tests. Further, Dr. Marks admitted that those patients' symptoms could have been caused by other medical reasons.
Dr. Marks testified about his educational background, which included an undergraduate degree in biology from California State University and both a Ph.D. and M.D. from the University of California. Dr. Marks testified that he was certified by the American Board of Internal Medicine and licensed to practice in New York, Alabama and Mississippi. He testified that he currently worked at a hepatitis clinic, that many of his patients were current or former drug users and that this gave him experience with problems of drug use and addiction. Dr. Marks was formerly an associate director of research for Hoffman LaRoche Pharmaceuticals *1142 and the director of clinical research at Aventis Pasteur Pharmaceuticals. He testified that he worked as a medical legal consultant and has testified as an expert witness in cases similar to the present one. Dr. Marks also testified that, while working in the emergency room during his medical residency, he had seen a few cases of PCP intoxication and that he had reviewed the subject and how to treat it. Defendant sought to tender Dr. Marks as an expert in the field of the adverse effects of drug abuse; the State objected, and the trial court sustained the objection.
Dr. Marks then testified more about his experience with the pharmaceutical companies and how he was in charge of evaluating adverse effects of the medications being tested, which were mostly antibiotics and vaccines. Dr. Marks testified that he had been qualified to testify as an expert regarding the adverse effects of drug use in Texas, New York, New Jersey and Pennsylvania. On cross-examination, Dr. Marks testified that, while his experience with the pharmaceutical companies did not include evaluating those taking PCP, he did evaluate patients who experienced adverse psychiatric effects from anti-malarial medication and adverse central nervous system effects from antibiotic medication. Dr. Marks further testified that his only experience with PCP intoxication had been two patients he saw in the emergency room and that it had been over 15 years ago. The State maintained its objection in regard to Dr. Marks being accepted as an expert, and the trial court sustained the objection.
On redirect, Dr. Marks testified that PCP is only produced illegally and that it has not been produced legally for human use since 1965. Dr. Marks testified that the two patients he observed with PCP intoxication had been brought to the emergency room by police officers who said the patients had been found with PCP in their possession, but said that the manic state that they were in made it difficult to question them or to perform a physical examination. Dr. Marks further explained that these patients had symptoms associated with use of a PCP-like drug, such as agitation, being disoriented and delusional and that they were difficult to physically control. On re-cross examination, Dr. Marks acknowledged that he was unsure as to whether there had been some kind of "chemical confirmation" that those patients were intoxicated with PCP and that there were other possible medical causes for the behavior these patients were exhibiting. Dr. Marks also testified that the clinical pharmacology of PCP has not changed in 20 years. After considering the arguments of counsel, the trial court refused to qualify Dr. Marks as an expert witness for the following reasons:
The doctor's testimony was clear that he remembers two cases of what he thought was PCP. That his memory . . . the best he can remember, it was fifteen years ago. I can relate because doctors have tons of patients. And he does research and he's testified he's done research reference vaccine evaluations and others and adverse effects of clinical drugs, being for pharmaceutical companies, not for illegal drugs. And he testified that based on hearsay testimony, what the officers said, he believed they to be under PCP and that he believes that there may have been clinical confirmation. No way he would know because it was too long ago. The best he could remember. And so basically he thinks that he can recall that but he does not know for sure. He testified uncontradicted that the exhibit of behavior that he saw could have been from several things. That . . . He did not testify that he did a screening that narrowed it down absent the clinical confirmation to *1143 PCP. Based on that the Court finds that his testimony is not material and that he does not meet the Daubert analysis to testify in this trial. I'm going to exclude it.
According to La. C.E. art. 702, expert testimony is admissible under the following conditions:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In State v. Foret, 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding the proper standards for the admissibility of expert testimony, which requires the trial court to perform a "gatekeeping" function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. State v. Allen, 41,548 (La.App. 2d Cir.11/15/06), 942 So.2d 1244, citing State v. Chauvin, 02-1188 (La.5/20/03), 846 So.2d 697.[1] In so doing, the Louisiana Supreme Court adopted Daubert's requirement that technical or scientific expert testimony must rise to a threshold level of reliability before it is admissible under La. C.E. art. 702. State v. Allen, supra. Even so, while the trial court may consider one or more of the four Daubert factors, those factors do not necessarily or exclusively apply to all experts or in every case. State v. Allen, supra, citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181 (La.2/29/00), 755 So.2d 226.
The trial court has great discretion in determining the competence of an expert witness and that determination will not be overturned absent an abuse of discretion. State v. Higgins, 03-1980 (La.4/1/05), 898 So.2d 1219, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005); State v. George, 39,959 (La. App. 2d Cir.10/26/05), 914 So.2d 588, writ denied, 06-0707 (La.10/6/06), 938 So.2d 66; State v. Gipson, 37,132 (La.App. 2d Cir.6/25/03), 850 So.2d 973, writ denied, 03-2238 (La.1/30/04), 865 So.2d 75. The test of competency of an expert is his knowledge of the subject about which he is called to express an opinion, which may be shown through a combination of that expert's specialized training, work experience and practical application of the expert's knowledge. State v. Gipson, supra.
In the present case, the trial court did not abuse its discretion in excluding Dr. Marks as an expert witness. While Defendant proffered Dr. Marks as an expert in the adverse effects of drug abuse, Defendant's argument clearly indicates that he sought to use Dr. Marks specifically for the purpose of proving to the jury that he was intoxicated on PCP at the time of the offenses and that the PCP caused him to commit crimes that he would not have otherwise committed. The testimony showed that Dr. Marks has impressive credentials generally and specifically in regard *1144 to the research and development of pharmaceuticals and in treating hepatitis patients who may be drug abusers. Even so, the testimony showed that his only experience with PCP intoxication was from two patients he treated in an emergency room over 15 years ago, and it is unclear whether there was any medical confirmation that those patients actually suffered from PCP intoxication. While Dr. Marks may have reviewed the literature on the diagnosis and treatment of PCP intoxication, it appears that his actual experience with PCP intoxication was extremely limited and, possibly, nonexistent. Accordingly, the trial court did not abuse its discretion in excluding Dr. Marks as an expert witness on this particular subject because it does not appear that he had the specialized knowledge necessary to help the jury determine whether Defendant's behavior was the result of PCP intoxication.
This assignment is, therefore, without merit.
Assignment of Error Number Two (verbatim): The trial court erred by finding that there was sufficient evidence of intoxication.
Defendant presented no argument in brief on the issue of whether the trial court erred by finding that there was sufficient evidence of intoxication. The assignment makes no sense in regard to the present case because the jury was charged with making that finding, not the trial court. Defendant did not specifically argue in his motion for post-verdict judgment of acquittal that he proved involuntary intoxication by a preponderance of the evidence, so the assignment still does not make sense even if counsel was trying to argue that the trial court erred in denying the post-verdict motion. In the "ISSUES ON APPEAL" portion of Defendant's brief, counsel asks, "Did the defendant prove involuntary intoxication by a preponderance of the evidence?" No argument is offered in regard to the issue of involuntary intoxication in the brief. Assignments of error which are neither briefed nor argued are considered abandoned. U.R.C.A. 2-12.4; State v. Schwartz, 354 So.2d 1332, fn. 1 (La.1978); State v. King, 41,084 (La.App. 2d Cir.6/30/06), 935 So.2d 815, writ denied, 06-1803 (La.2/16/07), 949 So.2d 411; State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writs denied, 558 So.2d 1123 (La.1990). Further, a mere statement of an assignment of error in a brief does not constitute briefing of the assignment; and, therefore, the assignment is deemed abandoned. State v. Lee, 39,969 (La.App. 2d Cir.8/17/05), 909 So.2d 672, writ denied, 06-0247 (La.9/1/06), 936 So.2d 195, citing State v. Toney, 26,711 (La.App. 2d Cir.3/1/95), 651 So.2d 387. To the extent that Defendant bore the burden of proving by a preponderance of the evidence the affirmative defense of involuntary intoxication, that will be discussed generally in Assignment of Error Number Three. Further, the State briefed the issue of involuntary intoxication as part of its argument for Assignment of Error Number Three.
Assignment of Error Number Three (verbatim): The trial court erred by finding that there was sufficient evidence to convict Defendant of Attempted Second Degree Murder.
Defendant argues that the evidence was insufficient to support his conviction for attempted second degree murder because there was no evidence that he actually pointed the gun at Reed or any other victim. Defendant argues on appeal that he was so close to Reed that he could have shot him if that had been his intention. The State argues that the evidence of Reed's testimony shows that Defendant did have the specific intent to kill Reed. *1145 Although Defendant makes no actual argument on appeal in regard to voluntary intoxication, the State argues that Defendant failed to prove the affirmative defense of involuntary intoxication in light of the fact that there was contradictory evidence of whether the intoxication was involuntary and that the others who smoked the same PCP-laced marijuana cigarette did not commit violent felonies as Defendant did on that day.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In the absence of internal contradictions or irreconcilable conflict with physical evidence, the testimony of one witness is sufficient support for a requisite factual conclusion if that witness is believed by the trier of fact. State v. Jones, 31,613 (La.App. 2d Cir.4/01/99), 733 So.2d 127, writ denied, 99-1185 (La.10/01/99), 748 So.2d 434, citing State v. Ford, 28,724 (La.App. 2d Cir.10/30/96), 682 So.2d 847, writ denied, 99-0210 (La.5/14/99), 745 So.2d 12. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, the matter is one of the weight, not the sufficiency, of the evidence. State v. Allen, 36,180 (La.App. 2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566 and 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/05/99), 737 So.2d 747. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Barakat, 38,419 (La.App. 2d Cir.6/23/04), 877 So.2d 223, citing State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, supra. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Barakat, supra, citing State v. Anderson, 36,969 (La. App. 2d Cir.4/9/03), 842 So.2d 1222. To convict a defendant based upon circumstantial evidence, it must exclude every reasonable hypothesis of innocence. State v. Barakat, supra, citing La. R.S. 15:438.
Second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Although the complete crime of second degree murder can be proved by showing either specific intent to kill or to inflict *1146 great bodily harm, the state must prove that the defendant had the specific intent to kill in order to support a conviction for attempted second degree murder. State v. Bouie, 00-2934 (La.5/14/02), 817 So.2d 48, fn. 2, citing State v. Huizar, 414 So.2d 741 (La.1982), State v. Strother, 362 So.2d 508 (La.1978); State v. Carter, 34,677 (La.App. 2d Cir.5/9/01), 787 So.2d 509, writ denied, 01-1707 (La.5/3/02), 815 So.2d 93. In State v. Mitchell, 39,202 (La.App. 2d Cir.12/15/04), 889 So.2d 1257, writ denied, 05-0132 (La.4/29/05), 901 So.2d 1063, this court stated that the specific intent to kill could be inferred from the circumstances, such as discharging a firearm aimed at a person within close range:
Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Ellis, 28,282 (La.App. 2d Cir.06/26/96), 677 So.2d 617, writ denied, 96-1991 (La.02/21/97), 688 So.2d 521. As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Kahey, 436 So.2d 475 (La.1983); State v. Murray, 36,137 (La.App. 2d Cir.08/29/02), 827 So.2d 488, writ denied, 02-2634 (La. 09/05/03), 852 So.2d 1020; State v. Ellis, supra. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Murray, supra; State v. Johnson, 27,522 (La.App. 2d Cir.12/06/95), 665 So.2d 1237. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982).
We conclude that the State presented sufficient evidence that Defendant had the specific intent to kill Reed. Reed testified that Defendant grabbed him by the throat, that he saw something shiny coming up toward him as he jerked away from Defendant, that he saw a flash, that he felt a gunfire blast go within two to three inches of his face and that he felt fragments from the blast actually hit his face. Reed testified that after he went back outside, Defendant said, "Mot Reed, I see you, bitch," and fired another shot at him. Reed believed that Defendant would have shot him in the forehead if he had not jerked back. This testimony was evidence that Defendant was aiming the gun at Reed and that he fired the gun at Reed within very close range. Accordingly, we find that the State presented sufficient evidence from which a rational jury could determine that Defendant had the specific intent to kill Reed and that he attempted to do so by firing the handgun at Reed.
Defendant argued at trial that he was not responsible for his conduct due to being involuntarily intoxicated at the time of the offenses.[2] According to La. R.S. 14:15(1), involuntary intoxication is a complete defense for criminal behavior:
(1) Where the production of the intoxication or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender *1147 is exempt from criminal responsibility.
If a defendant proves that he was intoxicated at the time of the offense, the state has the burden of negating that defense by proof beyond a reasonable doubt. State v. Mitchell, supra, citing State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). In the present case, Defendant's medical records indicate that he tested positive for PCP and marijuana when he was taken to the hospital after his arrest.
Even so, the evidence that the intoxication was involuntary or that the intoxication directly caused him to commit these crimes was controverted by the State's evidence. Mitchell testified that Defendant did not know that the marijuana cigarette was laced with PCP. Conversely, Investigator Brown testified that Mitchell told him that Defendant and everyone at the barbeque knew that the marijuana cigarette was laced with PCP. Mitchell's credibility was further challenged by the fact that he was incarcerated at the time of his testimony and by the fact that he did not go to police with this information. Further, Defendant presented no evidence that the PCP directly caused him to commit these crimes. Rather, on cross-examination, Mitchell testified that he and others smoked this same cigarette, but that neither he nor anyone else who had smoked that cigarette tried to kill, rob or carjack anyone else that day. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part as to issues regarding the question of intoxication. State v. Mitchell, supra, citing State v. Jordan, 31,568 (La.App. 2d Cir.2/24/99), 728 So.2d 954, writ denied, 99-0893 (La.10/8/99), 750 So.2d 177. Defendant did not meet his burden of proving involuntary intoxication because he presented no evidence that the intoxication directly caused him to commit these offenses. Moreover, in light of the contradictory evidence regarding whether the intoxication was involuntary and the lack of evidence regarding whether the intoxication caused Defendant to commit these crimes, a rational jury could properly conclude beyond reasonable doubt that involuntary intoxication was not proven in this case.
This assignment is, therefore, without merit.
Assignment of Error Number Four (verbatim): The trial court erred by sentencing the defendant to consecutive rather the [sic] concurrent sentences.
Defendant argues that the consecutive sentences imposed were excessive because this was his first felony conviction and because these crimes arose from a single course of conduct. Defendant further argues that the trial court's reasoning was based upon facts not in evidence and that there are no reasons that justify the consecutive sentences imposed by the trial court. The State counters that the trial court did not abuse its discretion in ordering the consecutive sentences because they arose from separate incidents involving different victims and because Defendant was a second-felony offender with a violent criminal history. The State further urges that Defendant voluntarily ingested PCP and intentionally committed these violent crimes against victims who had done nothing to provoke him, putting them in fear for their lives.
Although Defendant filed a motion to reconsider sentence, it was not filed within 30 days of sentencing as required by La. C. Cr. P. art. 881.1(A)(1). The record indicates that the trial court sentenced Defendant on January 27, 2006, but that his motion to reconsider sentence *1148 was not filed until March 24, 2006. When a defendant fails to timely file a motion to reconsider sentence pursuant to La. C. Cr. P. art. 881.1, the appellate court's review is limited to the bare claim that the sentence is constitutionally excessive. State v. Mims, 619 So.2d 1059 (La.1993); State v. Jones, 41,449 (La.App. 2d Cir.9/20/06), 940 So.2d 61; State v. Duncan, 30,453 (La. App. 2d Cir.2/25/98), 707 So.2d 164. Further, in the motion to reconsider sentence, Defendant did not specifically allege that the sentences were excessive for being imposed consecutively. According to La. C. Cr. P. art. 881.2(A)(1), review of a sentence is restricted to the grounds raised in the motion to reconsider sentence. Even if Defendant had timely filed his motion to reconsider sentence, he would still be precluded from review of his sentences based upon the argument that the trial court erred by imposing them consecutively. Thus, this court's review of Defendant's sentences is limited to whether the sentences were constitutionally excessive.
In reviewing claims of excessive sentence, an appellate court uses a two-step process. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not a rigid or mechanical compliance with its provisions. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App. 2d Cir.6/24/98), 715 So.2d 641. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Haley, 38,258 (La. App. 2d Cir.4/22/04), 873 So.2d 747, writ denied, 04-2606 (La.6/24/05), 904 So.2d 728.
Second, whether the sentence imposed is too severe depends on the circumstances of the case and the background of Defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985).
There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App. 2d Cir.3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385. As a general rule, maximum sentences are appropriate in cases involving the most serious violation of the offense and the worst type of offender. State v. Grissom, 29,718 (La.App. 2d Cir.8/20/97), 700 So.2d 541; State v. Walker, 573 So.2d 631 (La.App. 2d Cir.1991). The trial court shall exercise its sentencing discretion to impose sentences according to the individualized circumstances of the offense and the offender. State v. Rogers, 405 So.2d 829 (La.1981). A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case and, therefore, is given broad discretion *1149 in sentencing. State v. Cook, 95-2784 (La.5/31/96), 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). The trial court is given wide discretion to impose a sentence within the statutory limits, and a sentence imposed by the trial court should not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Williams, 03-3514 (La.12/13/04), 893 So.2d 7, citing State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330, State v. Washington, 414 So.2d 313 (La.1982); State v. Abercrumbia, 412 So.2d 1027 (La.1982); State v. Hardy, 39,233 (La.App. 2d Cir.1/26/05), 892 So.2d 710. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Cook, supra.
At the sentencing hearing, the trial court first noted that Defendant was found guilty as charged for attempted second-degree murder, armed robbery and two counts of carjacking. The trial court considered Defendant's social history, noting that he was 26 years old, that he never knew his father and that he was raised by his grandmother, who was a very hard-working woman. The trial court noted Defendant's educational and employment history, which included dropping out of high school in the eleventh grade without pursuing a GED and the fact that Defendant had only retained some part-time employment. The trial court recounted the facts of the case and the severe emotional trauma sustained by the victims. The trial court also recounted Defendant's criminal history, which indicated that Defendant had a series of misdemeanor convictions, some of which were of a violent nature, and a prior felony conviction for aggravated flight from an officer. The trial court noted that Defendant did not successfully complete his felony probation. The trial court further noted that Defendant had previously been acquitted of second-degree murder and that the facts of that case were very similar to the facts of the present case.
The trial court related that the probation officer conducting the pre-sentence investigation recommended a maximum sentence, due in part to the fact that the victims now fear for their lives. In considering the aggravating circumstances listed in the sentencing guidelines of La. C. Cr. P. art. 894.1, the trial court noted that Defendant's conduct threatened serious harm and caused severe emotional trauma to the victims; that Defendant was armed with a handgun and used it during his crimes; that the victims did nothing to provoke Defendant's actions; that Defendant voluntarily ingested PCP; that Defendant would be unable to compensate the victims for their emotional trauma; that Defendant has a significant criminal history; that Defendant had been unsuccessful while on a previous felony probation; that Defendant's actions were the result of conduct likely to recur; that Defendant had made excuses for his behavior in an effort to escape responsibility; and that incarceration would not adversely affect any dependents. Further, the trial court noted that it found no mitigating circumstances. As a result, the trial court found that there was an undue risk of Defendant committing another crime if given a suspended sentence or probation, that any lesser sentence would deprecate the seriousness of his conduct and that Defendant was in need of correctional treatment that would be best provided in a custodial environment. Thus, a review of the record indicates that the trial court was cognizant of the sentencing considerations of La. C. Cr. P. art. 894.1.
The sentencing range for attempted second-degree murder is imprisonment at *1150 hard labor for not less than 10 years nor more than 50 years without benefit of parole, probation, or suspension of sentence. La. R.S. 14:27(D)(1)(a) and 14:30.1. The sentencing range for armed robbery is imprisonment at hard labor for not less than 10 nor more than 99 years without benefit of parole, probation or suspension of sentence. La. R.S. 14:64(B). The trial court imposed a sentence of 45 years at hard labor for attempted second-degree murder and 70 years at hard labor for armed robbery all to be served without benefit of parole, probation or suspension of sentence, and the trial court ordered that these two sentences be served concurrently. Thus, the trial court did impose a sentence within the upper level of the sentencing range for those offenses. In regard to both counts of carjacking, the trial court imposed the maximum sentence of 20 years at hard labor without benefit of parole, probation or suspension of sentence and ordered that the carjacking sentences be served concurrently to each other and consecutively to the sentences for attempted second degree murder and armed robbery. La. R.S. 14:64.2(B).
Consecutive sentences under certain circumstances are not necessarily excessive. State v. Wilson, 42,075 (La. App. 2d Cir.5/9/07), 957 So.2d 345, citing State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980). Although La. C. Cr. P. art. 883 favors the imposition of concurrent sentences for crimes committed as part of the same transaction or series of transactions, a trial court retains the discretion to impose consecutive sentences in cases where the offender's criminal history and other circumstances in his background justify treating him as a grave risk to the safety of the community. State v. Walker, 00-3200 (La.10/12/01), 799 So.2d 461; State v. Feaster, 36,868 (La.App. 2d Cir.3/5/03), 840 So.2d 675; State v. Johnson, 35,487 (La.App. 2d Cir.1/23/02), 806 So.2d 960. All factors in the case are to be considered in choosing whether to impose consecutive or concurrent sentences, including the defendant's criminal history, the gravity or dangerousness of the offense, the viciousness of the crimes, the harm done to the victims, and the potential for Defendant's rehabilitation. State v. Yossett, 41,926 (La.App. 2d Cir.4/25/07), 956 So.2d 109, citing State v. Morgan, 40,976 (La.App. 2d Cir.4/12/06), 926 So.2d 822, State v. Maxie, 30,877 (La.App. 2d Cir.8/19/98), 719 So.2d 104.
Considering the circumstances the trial court noted at the sentencing hearing, which include the violent nature of the offenses, the trauma to the victims and Defendant's criminal history, the consecutive sentences do not shock the sense of justice. These circumstances clearly indicate that Defendant is in need of correctional treatment in a custodial facility and that any lesser sentence would deprecate the seriousness of his actions. Thus, we conclude that the trial court did not abuse its discretion and that the consecutive sentences are not constitutionally excessive.
This assignment is without merit.

CONCLUSION
For the foregoing reasons, the convictions and sentences of Defendant, Tremaine Taylor, are affirmed.
AFFIRMED.
CARAWAY, J., dissents with written reasons.
CARAWAY, J., dissenting.
This defendant went on a bizarre random crime spree. When arrested, his strange behavior even led authorities to seek medical attention for him, and tests confirmed the drug PCP in his system.
*1151 The three crimes for which defendant was convicted are specific intent crimes. La. R.S. 14:10. Although defendant may have argued that his drugged condition was involuntary, it was irrelevant how he was drugged with PCP because La. R.S. 14:15(2) provides:
Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
What is PCP? Was the amount in defendant's system significant? With the predicate facts of defendant's bizarre conduct and drug test, these two questions beg for answers. They raise scientific medical issues for which the trier-of-fact needs some assistance. La. C.E. art. 702. Any medical doctor has the scientific understanding of basic pharmacology so as to at least assist a lay jury in a general understanding of this dissociative drug. The fact that Dr. Marks had not treated many PCP users does not mean that he lacked the expertise to explain the established scientific body of knowledge concerning this well-known drug. Other than the treating physician, who observed the defendant in his drugged state, any medical doctor would be somewhat limited to providing only a general explanation of this drug's neurological effects. Cf. State v. Jarreau, 96-1480 (La.App. 1st Cir.3/27/97), 692 So.2d 33, writ denied, 97-1122 (La.10/13/97), 703 So.2d 612.
In State v. Dorsey, 34,977 (La.App. 2d Cir.9/26/01), 796 So.2d 135, writ denied, 01-2876 (La.8/30/02), 823 So.2d 941, and writ denied, 01-2963 (La.10/14/02), 827 So.2d 414, the state's medical doctor's expertise was challenged. This court found that the doctor's testimony was admissible, noting that "generally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect on the weight to be given such testimony, not to its admissibility." Id. at 142. As an exaggerated example, a trained physician with a general understanding of rat poison's effect on the human body should be able to share his medical training and knowledge of the harm from such poison to assist the trier-of-fact without ever having treated a rat-poisoned patient. Any deficiency in actual experience goes to the weight of the testimony of a medical doctor as one of our society's most highly-trained scientific experts.
Dr. Marks has been a medical doctor for over twenty-five years. During his internship with the Air Force, he attended drug abuse patients on the base. His current employment at a hepatitis clinic involves problems with drug use and addiction. In the past, he worked in the pharmaceutical industry reporting to the FDA on the adverse effects of drugs on patients. Specifically regarding his experience with PCP, he testified as follows:
Q. Did you ever have occasion to research the adverse effects of PCP ingestion?
A. Yes. Well, after my residency I was assigned to do clinical research with the Army for four years at Letterman Army Research Institute in San Francisco. And I also had emergency room responsibilities there. And we did have some occasion to have PCP toxicity cases come in. So I remember back then doing a fairly good review of PCP intoxication and how to handle it medically. And in the course and preparation for this case reviewing the medical records and the incident report from the police and also examining Mr. Taylor, I've had a chance again to review the issue of PCP intoxication.
*1152 Clearly, in my opinion, the question before the trial court was not whether this indigent defendant had picked the best medical doctor with the greatest experience with PCP patients. Dr. Marks was well qualified to assist the trier-of-fact with the known and generally accepted body of scientific knowledge of the effects of PCP. The so-called gatekeeper's role in this case was improperly administered. The defendant was denied his right to present a defense. Accordingly, I respectfully dissent, would reverse the conviction and remand for a new trial.
NOTES
[1] The United States Supreme Court set out the following guidelines to consider as a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be applied to the facts at issue: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted by the relevant scientific community. Daubert v. Merrell Dow Pharmaceuticals, Inc., supra.
[2] According to La. R.S. 14:15(2), voluntary intoxication may be a defense to specific intent crimes "where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime." Defendant did not argue at trial or on appeal that voluntary intoxication deprived him of the ability to form the specific intent to commit attempted second degree murder. Further, as discussed above, the evidence that Defendant was firing a handgun at the victim indicates that Defendant did possess the specific intent to kill.