GASKINS, J.
 

 [following a jury trial, the defendant, Antonio D. Hall, was convicted as charged of second degree murder and sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. The defendant appealed, asserting that the evidence was insufficient. We affirm the defendant’s conviction and sentence.
 

 
 *297
 
 FACTS
 

 On January 4, 2006, the victim, Oscar “Buck” Youngblood, was shot and killed at his home in Haughton, Louisiana, by the defendant, who was his cousin. Also present at the victim’s residence that day were Jeffrey Stevens and his cousin, Charles “Chuck” Villard.
 

 According to their trial testimony, Stevens and Villard went to the victim’s home so Stevens could buy drugs from the victim. When they arrived, the victim introduced them to the defendant. Neither man had met the defendant before. Vil-lard testified that the defendant did not respond when they were introduced; however, he stated: “[I]f eyes could cut, he cut me in half with his eyes when we walked in.”
 

 Stevens and Villard went with the victim to a bedroom where Stevens paid the victim for methamphetamine. They remained in the room reminiscing and partaking of some of the newly purchased drugs.
 

 At some point, the three men became aware that the defendant was in the living room with a pistol. The victim told Stevens and Villard that they should leave. WTien they moved to exit out the front door in the living room, the defendant informed them that they were not leaving and told them to lock the front door. Because the defendant was armed, they complied.
 

 1 ¡¡The defendant then told Stevens and Villard that they were going to watch him kill the victim and that they could then kill him. The men protested, insisting that they did not want to watch him kill the victim and that they did not want to kill him. The defendant ordered the victim to cover the windows; he complied.
 

 For about 30 minutes, the defendant held the three men at gunpoint in the living room while he expressed his dissatisfaction with his life and aired his grievances against the victim. Among other things, he said that he had no job and no money; he also accused the victim of sleeping with his girlfriend. In addition to the pistol, the defendant had an SKS rifle. At various points during the ordeal, the defendant had the pistol in one hand and the rifle in the other.
 

 According to the other two men, the victim pled for his life. At one point, the victim got on his knees and began to pray. The defendant told him not to bother because he was going “to do it.” Shortly thereafter, the defendant fired the first shot.
 

 Immediately Stevens and Villard ran for the front door and, after finally managing to unlock it, fled outside. As they were going out the door, Villard heard the defendant fire another shot from the pistol. Villard jumped over a fence. He dropped his glasses and had to retrieve them. When he had them on again, he was able to see the defendant standing outside armed. Villard ran to his aunt’s house across the street. As he was running, he heard more shots fired; some were pistol shots while others were apparently from the rifle. After he arrived at his aunt’s house, he saw|;ithe victim’s car being driven out of the victim’s driveway. When Villard returned to the victim’s house, he found the victim on the ground in the front yard.
 

 Stevens testified that after he ran out of the house, he came to a fence and just “froze.” He remained there until the police arrived. He too heard additional gunshots as he ran.
 

 A neighbor with EMT training heard gunshots and called 911. He saw a ear leaving the victim’s driveway. When he went to the victim’s house, he found the victim lying in the front yard. He testified
 
 *298
 
 that the victim was nonresponsive and had a gunshot wound to the head. Based on his training, the neighbor testified that the victim was dead by the time he arrived. An autopsy revealed that the victim died as the result of two gunshot wounds. One bullet entered into the cranial cavity, causing extensive injury to the brain, and left a large gaping exit wound. A second bullet entered in the area of the left flank and passed through the liver, stomach and diaphragm before entering the chest cavity; a large caliber jacketed bullet was recovered from the left side of the victim’s chest.
 

 The victim’s car was soon located at the Shreveport apartment complex where the defendant’s girlfriend lived. When the police asked her if she owned a weapon, she said she had an SKS rifle. When she went to retrieve it from a closet, she discovered it was missing. The next day she informed the police that the defendant had returned the rifle to her - apartment. The police recovered the weapon from her closet. Subsequent testing connected the rifle to four fired 7.62 x 39 mm cartridge cases | recovered at the crime scene. Although a bullet recovered from the victim’s body could not be positively identified as having been fired from the rifle, the rifle could not be eliminated as having fired it.
 

 A .32 caliber semiautomatic pistol was recovered from a couch in the victim’s house; its magazine contained four .32 caliber cartridges. Stevens testified that this gun belonged to the victim. Testing revealed that two .32 caliber cartridge cases recovered at the crime scene had been fired by or chambered in this pistol.
 

 The defendant was arrested. His clothing was confiscated and submitted for examination. Crime lab testing demonstrated that the victim’s blood was on one of the defendant’s tennis shoes.
 

 The defendant was initially charged with first degree murder, armed robbery and false imprisonment. The state reduced the homicide charge to second degree murder and opted not to pursue the other charges. The defendant was convicted as charged of second degree murder by a unanimous jury. The trial court imposed the mandatory sentence of life imprisonment at hard labor without benefits.
 

 The defendant appeals.
 

 SUFFICIENCY OF EVIDENCE
 

 In his only assignment of error, the defendant challenges the sufficiency of the evidence against him. In particular, he claims that he was depressed and under the influence of crystal meth at the time of the offense. Thus, he asserts that he lacked the specific intent to kill or inflict great bodily harm on the victim. He requests that this court reverse his conviction | (¡for second degree murder, substitute a conviction for manslaughter, and remand the case for sentencing for that offense.
 

 Law
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Cummings,
 
 95-1377 (La.2/28/96), 668 So.2d 1132;
 
 State v. Murray,
 
 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488,
 
 writ denied,
 
 2002-2634 (La.9/5/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder.
 
 State v. Pigford,
 
 2005-
 
 *299
 
 0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Robertson,
 
 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (LaApp. 2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529;
 
 State v. Gilliam,
 
 36,118 (LaApp. 2d Cir.8/30/02), 827 So.2d 508,
 
 writ denied,
 
 2002-3090 (La.11/14/03), 858 So.2d 422.
 

 | fiAn appellate court reviewing the sufficiency of evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Parker,
 
 42,311 (LaApp. 2d Cir.8/15/07), 963 So.2d 497,
 
 writ denied,
 
 2007-2053 (La.3/7/08), 977 So.2d 896;
 
 State v. Owens,
 
 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610,
 
 writ denied,
 
 1998-2723 (La.2/5/99), 737 So.2d 747.
 

 Second degree murder is defined in La. R.S. 14:30.1, in pertinent part, as: “the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm.... ” (Emphasis added.) Specific intent is defined in La. R.S. 14:10 as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant.
 
 State v. Taylor,
 
 42,627 (La.App. 2d Cir.10/24/07), 968 So.2d 1135.
 

 “Intoxication” is addressed in La. R.S. 14:15:
 

 The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
 

 (1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate | ythis condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.
 

 (2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime. [Emphasis added.]
 

 Intoxication is an affirmative defense. The burden of proof by a preponderance of the evidence rests upon defendant.
 
 State v. Tolbird,
 
 28,986 (La.App. 2d Cir.12/11/96), 685 So.2d 415;
 
 State v. Barlow,
 
 550 So.2d 899 (La.App. 2d Cir. 1989). If a defendant proves that he was intoxicated at the time of the offense, the state has the burden of negating that defense by proof beyond a reasonable doubt.
 
 State v. Taylor, supra; State v. Mitchell,
 
 39,202 (La.App. 2d Cir.12/15/04), 889 So.2d 1257,
 
 writ denied,
 
 2005-0132 (La.4/29/05), 901 So.2d 1063. The jury is the ultimate factfinder of whether a defendant proved his condition and whether the state negated that defense beyond a reasonable doubt.
 
 State v. Davis,
 
 92-1623 (La.5/23/94), 637 So.2d 1012,
 
 cert. denied,
 
 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994);
 
 State v. Legrand,
 
 2002-1462
 
 *300
 
 (La.12/3/03), 864 So.2d 89,
 
 cert. denied,
 
 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005). A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part as to issues regarding the question of intoxication.
 
 State v. Taylor, supra; State v. Mitchell, supra.
 

 |
 
 sDiscussion
 

 The defendant argues in his brief that he was intoxicated on drugs at the time of the offense and consequently he should not have been found to possess the requisite specific intent for a conviction of second degree murder. However, we find that the defendant did not carry his burden of proving his intoxication by a preponderance of the evidence at trial and that the deference accorded the decision of the jury does not permit us to second-guess its decision regarding the issue of intoxication.
 

 The only evidence presented regarding the intoxication of the defendant involved the testimony of Villard and Stevens. They indicated that the defendant seemed angry during the incident and that he talked about things that they did not understand, including his and the victim’s relationships with a woman and his lack of employment, among other things. Since neither of the witnesses had ever met the defendant before, it is not surprising that they were not aware of the circumstances of his life and thus found his complaints confusing. Furthermore, there is no indication that the defendant joined the other three men when they were smoking drugs in the bedroom, nor did either of the witnesses view the defendant partaking of any drugs while they were present in the home.
 

 During Villard’s cross-examination, defense counsel attempted to determine what the defendant’s behavior had been like that night:
 

 Q: How would you describe Antonio? How was he acting? Was he making coherent sentences? Was he rambling while they were arguing? How would you describe how he was acting?
 

 A: He just seemed to be just real upset, just rambling. He seemed to me to be like a person that was kind — it looked to me like a person that was tweaked out.
 

 |t,Q: What’s that mean?
 

 A: Just like somebody who is, I don’t know, just speeding or something, you know, just — just flipped out like.
 

 Q: So you would say he didn’t appear to be in his right mind? Did it look like he was going crazy? What did he look like?
 

 A: No, it was just like he — he was just like he was real angry, you know, just—
 

 Q: Did he look like he was, I think you told the police, going crazy or something like that? Did he look like he was going crazy?
 

 A: When I say crazy I mean just like just — like just, you know, he was real mad, you know.
 

 Although Villard at one point stated that the defendant reminded him of someone who was “speeding,” he subsequently stated that the defendant just seemed “real mad.” The testimony of this witness was not sufficient to meet the defendant’s burden of proving intoxication such that lack of specific intent could be proven.
 

 The evidence presented at trial indicates that the defendant had specific intent to kill the victim. The defendant took an SKS rifle from the home of his girlfriend when he went over to the victim’s house that night. He told Villard
 
 *301
 
 and Stevens to lock the door because no one was leaving the house. He held these two witnesses and the victim inside the home for 30 minutes while reminding them repeatedly that he was going to shoot the victim and then allow Villard and Stevens to shoot him. Immediately prior to shooting the victim, while the victim was on his knees praying for his life, the defendant stated “What are you praying for?” and reminded the victim that he was going to shoot him and there was “no sense in praying.” He then proceeded, over the course of the next few minutes, to shoot the victim twice. One gunshot wound was to the victim’s head. He lmfired two different weapons, one of which was an SKS rifle. The defendant then took the victim’s vehicle and fled to his girlfriend’s apartment complex.
 

 The determination of the jury that the defendant is guilty of second degree murder is sufficiently supported by the evidence and will not be disturbed on appeal.
 

 The assignment of error is without merit.
 

 CONCLUSION
 

 The defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.