889 So.2d 1257 (2004)
STATE of Louisiana, Appellee,
v.
Leamon MITCHELL, Appellant.
No. 39,202-KA.
Court of Appeal of Louisiana, Second Circuit.
December 15, 2004.
*1258 W. Michael Cady, Shreveport, for Appellant.
Paul J. Carmouche, District Attorney, Laura Wingate, Catherine M. Estopinal, Dhu Thompson, Assistant District Attorneys, for Appellee.
Before BROWN, WILLIAMS, and PEATROSS, JJ.
BROWN, C.J.
Defendant, Leamon Mitchell, was convicted as charged of second degree murder and was sentenced to life imprisonment at hard labor without benefit. Finding no error, however, we affirm defendant's conviction and sentence.

Discussion

Sufficiency of the Evidence
According to defendant, the trial court erred in denying his motions for new trial and for post-verdict judgment of acquittal. Likewise, defendant argues that the evidence was insufficient to convict him of second degree murder, and the verdict should have been manslaughter.[1]
*1259 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.02/28/96), 668 So.2d 1132; State v. Hunter, 33,066 (La.App.2d Cir.09/27/00), 768 So.2d 687, writs denied, 00-3070 (La.10/26/01), 799 So.2d 1150, 01-2087 (La.04/19/02), 813 So.2d 424. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/04/96), 680 So.2d 1165.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.08/30/02), 827 So.2d 508, writ denied, State ex rel. Gilliam v. State, 02-3090 (La.11/14/03), 858 So.2d 422. As noted by the supreme court in State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442, the appellate court does not assess the credibility of witnesses or reweigh evidence.
Second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Ellis, 28,282 (La.App.2d Cir.06/26/96), 677 So.2d 617, writ denied, 96-1991 (La.02/21/97), 688 So.2d 521. As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Kahey, 436 So.2d 475 (La.1983); State v. Murray, 36,137 (La.App.2d Cir.08/29/02), 827 So.2d 488, writ denied, 02-2634 (La.09/05/03), 852 So.2d 1020; State v. Ellis, supra. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Murray, supra; State v. Johnson, 27,522 (La.App.2d Cir.12/06/95), 665 So.2d 1237. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982).
The following testimony was adduced at defendant's trial.
On December 23, 2001, defendant went to the Sportsman's Lounge[2] on Travis Street in Shreveport, Louisiana, in search of his estranged wife, Cresta Mitchell.[3] The couple had been separated for about three weeks and Cresta was staying with a friend, Reggie Adkins, until she could get her own apartment. Cresta had begun dating someone else and had started a job as a bartender at the Sportsman's Lounge. Defendant got to the bar just before midnight, shortly before the victim's shift was *1260 to begin. Robert Huck, Jr., the owner of the bar, knew defendant, and talked with him about defendant's marital problems in a back room of the club. According to Huck, defendant's demeanor went from normal to frustrated and angry about the fact that his wife had a boyfriend. Defendant told Huck, "You know I am going to kill him," referring to Cresta's love interest. When Huck objected to this statement, defendant told him, "You know what I am going to do. I promise I won't do nothing here."
The two men talked for several minutes and defendant calmed down and stopped talking about killing Cresta's boyfriend. At that point defendant seemed to Huck to be logical. With the pretext of giving defendant a hug, Huck "patted down" defendant, looking for a weapon, which he did not find. Defendant then went out, sat down at the bar, ordered a beer, and waited for his wife.
Cresta came into the lounge a few minutes later, escorted by Rocky Yates and Reggie Adkins. Both men had known defendant for several years. Yates and Adkins had made sure Cresta got to work because of their concern about her safety around defendant. Adkins first sat with defendant to calm him down and get him out of the bar so Cresta could get to work. Yates, seeing that defendant appeared to be calm, started playing pool with another patron.
Defendant told Adkins that he would leave in a few minutes, but that he wanted to speak with Cresta first. Adkins agreed, and defendant began talking to his wife. Huck observed that as Cresta was starting to work behind the bar, she and defendant were talking "totally normal." Adkins stepped away from the bar, but continued to watch defendant and Cresta.
Defendant, however, suddenly began cursing and verbally abusing Cresta after he noticed a hickey on her neck. Huck and Adkins overheard defendant ask, "what the f**ck's that on your neck," and, "did that f**king punk put that on there." Huck heard Cresta reply that it was none of defendant's business. Huck and two other patrons, Corey Valdez Hobgood and Robert Miller, did not hear Cresta, Yates, or Adkins taunt or provoke defendant. Huck left the bar to buy supplies.
Consistent with the testimony of Robert Huck, both Yates and Adkins denied at trial that they taunted defendant at the bar. On cross examination, Yates admitted that during a phone conversation with defendant about ten days prior to the shooting, he had made a crude sexual comment about Cresta. Yates also conceded that he had a conviction for distribution of cocaine as well as a DWI 3rd offense. However, he denied a 1986 second degree battery conviction.
Reggie Adkins testified that he attempted to calm defendant down, and asked him to leave Cresta alone and to leave the bar. At that point, defendant loudly stated, "I will kill everybody in this mother f**ker." This comment was heard by Yates, Adkins, Hobgood, and Miller. Both Cresta and Adkins asked defendant whether he had a gun. Defendant told them both that he did not.
Defendant continued to verbally abuse Cresta, telling her, "I am tired of you all treating me like a f**king punk." Cresta replied, "well, quit acting like one then." At that point, defendant called Cresta a "bitch" and a "whore," stood up, pulled a Lorcin .380 caliber semi-automatic pistol from his pants pocket, pointed it across the bar at Cresta, and fired once at close range. The bullet struck the victim in the upper left chest, just above her heart, traveling from left to right, piercing her aorta, then her right lung, severing another artery in the lung. Cresta collapsed, face down, onto the floor behind the bar. The *1261 bullet went through her body and lodged in the wall of the bar. She died shortly thereafter at the hospital.
Adkins attempted to grab defendant, who wheeled around and tried to shoot Adkins; luckily, defendant's pistol jammed. Waving the gun back and forth, defendant threatened to kill everyone in the bar during his escape. The lounge patrons fled out the back door as defendant walked towards the front door, attempting to clear his jammed pistol. Defendant's threats to kill everyone in the bar were heard by Justin McGoltrick, who was walking through the front door of the bar at the same time. Defendant pointed the pistol at McGoltrick, who turned and quickly went back out the front door. McGoltrick saw defendant "messing with" the pistol and realized the gun was jammed. McGoltrick also watched defendant drive off and provided a description of the car to police.
After defendant left the bar, Adkins called 911, and he and McGoltrick attempted to give first aid to Cresta. Her last words were, "well, he won't be bothering me any more." Adkins then called defendant on his cell phone and told him that he had killed Cresta and to turn himself in to police. Defendant told Adkins that he was on his way to Dallas and refused to surrender to the authorities. In response to the statement that he had killed his wife, defendant replied, "I was upset. That's what she deserved."
Defendant's sister, Alma Mitchell, testified that defendant called her and told her that he had just shot Cresta. He also told Ms. Mitchell that he was going to their father's house in Webster Parish, east of Minden, and asked her to meet him there. Defendant deliberately hid his car behind his father's house in an effort to conceal it from view. He left the pistol in his car. When police found the gun, the jam had been cleared and the pistol had been reloaded.[4]
Alma Mitchell drove defendant back towards Shreveport. Defendant was shaking and stated, "Dear God, please just don't let her be dead." Worried about defendant's health and safety, Ms. Mitchell convinced him to go to Willis-Knighton Hospital in Bossier City. At the same time, defendant received a cell phone call from Michael Freeman, a Bossier City police officer. Officer Freeman, who had used defendant as a drug informant, told defendant that the Shreveport police were looking for him. Defendant agreed to turn himself in to Officer Freeman at the Bossier hospital.
Officer Freeman and Officer Todd Hilbert read defendant his Miranda rights. Defendant and the Bossier officers stood outside Officer Freeman's police cruiser, waiting for the Shreveport officers to arrive. Officer Freeman could tell that defendant had been drinking. Unknown to the officers, the video camera in Officer Freeman's police cruiser was taping the conversation between defendant and the Bossier officers. This videotape was later admitted into evidence. Officer Hilbert questioned defendant, who was initially upset and crying. Defendant told the officers that he shot Cresta because Adkins, Yates, and other "punks" in the bar had revved him up by telling him that they were having sex with Cresta. Defendant related that he had been pushed to the point that he had to do something. He further stated that he did not mean to shoot Cresta because he "loved the bitch."
During questioning, defendant calmed down and continued to talk to the officers in an attempt to justify his actions. Several times he asked the officers whether they *1262 would have done anything different if they had found out their wives were messing around on them. He also told the officers that he usually did not carry a weapon but had been doing so since the FBI had warned him of a threat on his life.[5]
Richard Beighley, a criminologist with the North Louisiana Crime Lab, testified that the bullet found in the wall of the Sportsman's Lounge was fired from the Lorcin pistol recovered from defendant's car. Beighley also testified that the trigger pull on defendant's pistol was stiffer than average, requiring a deliberate trigger pull of over nine and one-half pounds to fire the weapon.
Dr. George McCormick, Caddo Parish coroner, testified that the victim's gunshot wound was fatal. He further stated that powder residue or "stippling" that penetrated Cresta's shirt around the wound indicated that the gun was between a few inches and two feet from her when it was fired. The bullet also penetrated the victim's shirt with such force that it pulled her collar back hard enough to bruise her neck. Tests showed that she had a blood alcohol content of .078, together with traces of methamphetamine and buthanlital (a sedative likely from surgery performed in an attempt to save her life).
It is undisputed that defendant shot and killed his wife. Defendant has claimed that his intoxicated state precluded him from having the specific intent to kill or to inflict great bodily harm and that his conduct falls within the parameters of manslaughter.
La. R.S. 14:15(2) provides:
Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
If defendant proves that he was intoxicated at the time of the offense, the state has the burden of negating that defense by proof beyond a reasonable doubt. State v. Davis, 92-1623 (La.05/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part as to issues regarding the question of intoxication. State v. Jordan, 31,568 (La.App.2d Cir.02/24/99), 728 So.2d 954, writ denied, 99-0893 (La.10/08/99), 750 So.2d 177.
The record shows that, although defendant has claimed that he was too intoxicated to form the specific intent to kill or inflict great bodily harm, he nonetheless was sober enough to arm himself, drive to the bar, and engage in coherent conversations with the club owner, several of his acquaintances, and the victim. Defendant was able to deceive all of these persons regarding the fact that he was armed. He then confronted and verbally abused his wife, escalating the situation until finally pulling the gun and shooting her at close range. Defendant then threatened to shoot other patrons before leaving the club. He cleared his weapon of the jammed round, then drove his car to Minden and hid both the vehicle and weapon behind his father's house. Defendant then turned himself in to the authorities and engaged in a coherent discussion with the officers during which he attempted to justify his actions. Clearly, the evidence *1263 proved beyond a reasonable doubt that defendant's alcohol consumption neither caused him to commit this crime nor prevented him from forming the requisite specific intent.
Defendant has also urged that the facts better support a conviction for manslaughter. A homicide which would otherwise be second degree murder is manslaughter when it is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31. "Sudden passion" or "heat of blood" are not separate elements of the crime of manslaughter but are mitigating factors in the nature of a defense which exhibit a degree of culpability less than that present when a homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986); State v. Scott, 31,379 (La.App.2d Cir.10/28/98), 720 So.2d 415, writ denied, 99-0170 (La.05/14/99), 741 So.2d 664; State v. Stewart, 26,168 (La.App.2d Cir.08/17/94), 641 So.2d 1086, writ denied, 94-2363 (La.01/13/95), 648 So.2d 1337.
A defendant is required to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be appropriate. State v. Robinson, 32,794 (La.App.2d Cir.03/01/00), 754 So.2d 311, writ denied, 00-0989 (La.03/23/01), 787 So.2d 1008. In reviewing a defendant's claim that he met that burden, the appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. State v. Robinson, supra; State v. Lewis, 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.05/16/97), 693 So.2d 797.
Defendant argues provocation as a mitigating factor to support a manslaughter conviction. Provocation is a question of fact to be determined by the trier of fact. In order to be entitled to the lesser verdict of manslaughter, a defendant is required to prove mitigatory factors by a preponderance of the evidence. State v. Lombard, supra; State v. Mackens, 35,350 (La.App.2d Cir.12/28/01), 803 So.2d 454, writ denied, 02-0413 (La.01/24/03), 836 So.2d 37.
Even if the jury had determined that the victim and her friends had insulted and berated defendant in the manner he related to police, these actions were insufficient to mitigate defendant's action from second degree murder to manslaughter. As noted by the court in State v. Lombard, supra, provocative acts held to rise to the level of mitigating conduct involve physical threats or actions on the part of the victim. See also State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.1987), writs denied, 508 So.2d 64, 65 (La.1987). Mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter. State v. Massey, 535 So.2d 1135 (La.App. 2d Cir.1988).
Considering the totality of the evidence in this case, a rational trier of fact could have found that defendant did not establish by a preponderance of the evidence the mitigating factors or intoxication, provocation, or sudden passion or heat of blood. The evidence is sufficient to support defendant's conviction of the second degree murder of his wife. These assignments of error are without merit.

Ineffective Assistance of Counsel
To support his claims of ineffective assistance of counsel, defendant has attached to his brief affidavits executed by himself and Catherine Page. Neither defendant nor Ms. Page testified at trial. Defendant has also referred to statements and police *1264 reports which were not introduced into evidence at trial. This court can not consider these affidavits or references, inasmuch as an appellate court can neither review evidence that is not in the record before it on appeal nor receive new evidence. State v. Atkins, 32,519, 32,520 (La.App.2d Cir.10/27/99), 746 So.2d 220, writ denied, 99-3369 (La.05/05/00), 761 So.2d 542.
Defendant has alleged that his counsel committed pretrial and trial errors. The record contains little or no information regarding these allegations, and these claims would be more appropriately asserted in a petition for post-conviction relief where, if the trial court saw fit, new evidence could be taken. Ordinarily, a claim of ineffective assistance of counsel is more properly presented in an application for post-conviction relief because it generally requires additional evidence for resolution of the claim, and post-conviction allows a format for receiving such evidence. State v. Milligan, 28,660 (La.App.2d Cir.12/11/96), 685 So.2d 1127, writ denied, 97-0379 (La.06/30/97), 696 So.2d 1005.
In the interest of judicial economy, however, issues may be resolved on direct appeal if the record contains sufficient evidence pertaining to the matter. Id. The instant record does allow this court to review defendant's assignment which alleges error in his trial counsel's failure to object to the state's rebuttal argument.
According to defendant, in its rebuttal, the state went far beyond answering the argument of defense counsel as provided for in La. C. Cr. P. art. 774.
Although a prosecutor's rebuttal is confined to answering defendant's closing argument, a prosecuting attorney has wide latitude in choosing closing argument tactics. State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000); State v. Martin, 539 So.2d 1235 (La.1989). A trial judge has broad discretion in controlling the scope of closing arguments. Id. Furthermore, even if the prosecutor exceeds the bound of proper argument, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278 (La.01/19/00), 751 So.2d 393.
The trial transcript shows that the district attorney basically repeated his closing argument during his rebuttal. The remainder of the rebuttal appears to be in response to defendant's closing argument. We have not found any remark which falls beyond the scope of La. C. Cr. P. art. 774. This assignment of error is without merit.

Excessive Sentence
This assignment of error, not having been briefed, will not be addressed on appeal. U.R.C.A. Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writs denied, 558 So.2d 1123 (La.1990).

Conclusion
Defendant's conviction and sentence are AFFIRMED.
NOTES
[1] In his brief, defendant's appellate counsel lists eight assignments of error, but his argument essentially ignores the specific assignments. Instead, most of the brief is spent addressing those assignments which relate to defendant's claim of ineffective assistance of counsel. In a general argument relating to the (in)sufficiency of the evidence, defense counsel has argued that the evidence establishes defendant's guilt of manslaughter, not second degree murder.
[2] The bar is referred to in the record as the "Sportsman's Lounge," "Sportsman's Bar and Grill," and "Sportsman's Bar."
[3] The victim's name appears in the record and trial transcript as "Cresta" and "Crestin." In both the indictment and death certificate, she is referred to as "Cresta."
[4] An unfired round was found on the floor of the bar during the investigation.
[5] Special Agent Bryan Long with the FBI testified on behalf of defendant. Long stated that on December 11, 2001, he had advised defendant that he had received an uncorroborated source of information that defendant's life or safety may be in jeopardy. Long, however, denied telling defendant that he should get a gun.