Judgment rendered May 20, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,506-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

BOBBY RAY SAWYER                            Appellant

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Union, Louisiana
Trial Court No. 2017F54717

Honorable Bruce Edward Hampton, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By:  Mary Constance Hanes

JOHN FITZGERALD BELTON                 Counsel for Appellee
District Attorney

ERIC MICHAEL MAHAFFEY
CLIFFORD ROYCE STRIDER, III
Assistant District Attorneys

* * * * *

Before WILLIAMS, PITMAN, and STONE, JJ.

**STONE, J.**

Following a jury trial, the defendant, Bobby Ray Sawyer ("Sawyer"), was convicted of attempted second degree murder. He was sentenced to 35 years of incarceration at hard labor without benefits, and now appeals. For the following reasons, Sawyer's conviction and sentence are affirmed.

## FACTS AND PROCEDURAL HISTORY

On August 22, 2017, Sawyer was charged with attempted second degree murder of Amanda Jesslink ("Ms. Jesslink"). The offense occurred on June 23, 2017. A trial was held July 31-August 1, 2019. The state called three witnesses at trial: (1) Ms. Jesslink, the victim; (2) Deputy Huey P. Middleton, Jr., ("Dep. Middleton") of the Union Parish Sheriff's Office ("UPSO"), the detective who worked the case; and (3) Kenneth Armstrong ("Mr. Armstrong"), a neighbor who overheard the incident. The trial testimony is summarized in the following.

### Ms. Jesslink's testimony

Ms. Jesslink lives at 520 Albert Smith Road, Farmerville, Louisiana. Sawyer is her brother. She identified him in court as the defendant. She went outside on June 23, 2017, and saw that the garden hose was stretched across her driveway towards the nearby tool shed that Sawyer used as his residence.[1]

Ms. Jesslink, Sawyer, and their brother, Steffon Sawyer ("Steffon") share a driveway. Ms. Jesslink testified that it is only about 20 feet between her residence and Sawyer's shed. On the date of the offense, Steffon, who

---

[1] Ms. Jesslink stated that there were trailers on the property that Sawyer could have lived in, but Sawyer built a room inside the tool shed, and it was his choice to live there.

also lived next door to Ms. Jesslink, was going to mow her yard, and the garden hose was in the way, stretched across the driveway toward Sawyer's shed.[2]

Ms. Jesslink went to Sawyer's residence and "knocked on the side of the building to get his attention," and asked him why he kept leaving the hose laying across the yard. She stated that any time she wanted to speak with Sawyer, she would knock on the side of his residence, and he would come outside and see what she wanted; that was how the two communicated. She testified that after she knocked on his building, Sawyer began "hollering" at her, screaming and cursing for her to "get out of my house," and "get off my hill." Ms. Jesslink argued back at him.

During the argument, Sawyer was standing near a ladder, and Ms. Jesslink was pulling the hose back towards her house; thus, her back was turned toward Sawyer for much of the argument. While she and Sawyer were arguing, she was standing in the sun and Sawyer was standing in the shade, and she did not notice anything in his hands at the time. Ms. Jesslink testified that while they were arguing, Sawyer said, "I got something for you." At that point she turned around and could see that Sawyer was pulling at something. She described what Sawyer was pulling at as a reddish color blanket or cloth. She continued to watch what Sawyer was pulling at, and she saw him pull out a gun and point right at her face. Ms. Jesslink testified that the gun was a hunting gun or rifle, and she could see the barrel pointed at her. Sawyer had the gun's stock at his shoulder and had the muzzle pointed at her face; at that point, Sawyer was no longer yelling at her, but he

---

[2] Ms. Jesslink had pulled in the hose the preceding day, but on the date of the offense, the hose was again stretched back out across the driveway.

was "concentrating." Upon seeing this, Ms. Jesslink dropped to the ground in an evasive maneuver; she heard the gun go off at the same time that she dropped to the ground. She stated that Sawyer was about 40 feet from her when he fired the shot. She thought she had been hit because she "could feel it…could feel the sound of it."

Ms. Jesslink got on her feet and ran into her house. When asked if she heard the bullet "whiz by," she stated, "I can't even remember if I did or not, I just know I felt it…I was so terrified at that time." Ms. Jesslink testified that the only reason she did not get shot was because she dove for the ground.

Ms. Jesslink testified that she then called her neighbor and family friend, Mr. Armstrong, because he lived nearby, and she was afraid Sawyer was going to come into the house and shoot her. She testified that she did not own a weapon, and she wanted someone there. Ms. Jesslink testified that after speaking with Mr. Armstrong she called 9-1-1 and stayed on the phone with 9-1-1, standing near her front door with the door locked, until the police arrived. The 9-1-1 call was played in court. The audio of the call confirmed Ms. Jesslink's testimony regarding the argument with Sawyer and him shooting at her. In the call, a very excited and upset Ms. Jesslink stated several times that Sawyer pointed a rifle at her and shot it at her.

Ms. Jesslink affirmed that it was about 25 minutes between when the shot was fired and the police arrived, and about 20 minutes between when she called 911 and the police arrived. She did not see Sawyer during that time, and she did not know what he was doing. She stated that she could not see Sawyer's residence from inside her house, but she was watching the

other side of her fence to see if Sawyer came near her house because she was concerned that Sawyer was going to come and shoot her.

On cross-examination, Ms. Jesslink stated that Sawyer's aiming the gun at her, her dropping to the ground, and his shooting at her all happened at once. Her testimony indicated that she did not see Sawyer fire the weapon because she was diving to the ground at the moment of the shot. She admitted that Sawyer only fired one shot, and did not follow her and continue to shoot at her, but instead turned around and went back into his shed.

Ms. Jesslink stated that she had seen Sawyer shooting a firearm for target practice on his property, that he was experienced with weapons, and she had seen him with a gun prior to the date of the offense, but did not know what gun it was. She did not see Mr. Armstrong until later, after the police arrived, and she did not speak with him. Ms. Jesslink testified that, if Sawyer is taking care of himself, his mobility is "good." However, she also stated that Sawyer did not take care of himself. As an example of his mobility, she reported that had seen him walking home from half a mile down the road and offered him a ride; he declined because he preferred walking.

**Deputy Middleton's testimony**

Dep. Middleton was the UPSO detective who responded to the 9-1-1 call. On June 23, 2017, at approximately 1:30 p.m., he heard a call on his radio that there was a complaint of shots fired, that someone was shooting at another person. The call came from a residence at 520 Albert Smith Road, in Union Parish. Dep. Middleton arrived on the scene around 1:45 p.m., and knocked on the door of the residence. Ms. Jesslink answered, and she was

4

upset, crying, and visibly shaking. For safety, Dep. Middleton then located Sawyer, who was in his shed. Dep. Middleton identified Sawyer in court.

Dep. Middleton described Sawyer's residence as a "small storage building," with one entry. An aerial photograph admitted into evidence showed that Ms. Jesslink's house is close to Sawyer's shed, and is on the same or adjacent property. Dep. Middleton stated that there was trash piled up around the shed, and the photograph of the outside of the front entry to the shed corroborated that testimony. The photograph depicts a piece of material resting on some buckets and what appears to be a garbage can or barrel. Dep. Middleton described the material in his testimony as a red poncho. Dep. Middleton testified that the tail end of a gun case could be seen in the photograph, and that the poncho and the gun case could be seen when he walked up to Sawyer's residence. Dep. Middleton identified the gun case again in another photograph. Also, Dep. Middleton stated that Ms. Jesslink told him about the poncho and the gun case when he first spoke to her.

Dep. Middleton identified one photograph showing three live rounds of British 303 caliber ammunition, and stated that the ammunition was lying around the red poncho. Inside the gun case, which was not latched when he found it, Dep. Middleton found a box of 12 live rounds of British 303 ammunition. Dep. Middleton stated that the British 303 was initially made for military use, and it made a distinct sound when fired.

Dep. Middleton stated that when a firearm is discharged, gunpowder residue is emitted three to five feet from the muzzle of the weapon, and potentially out of the chamber. He also stated that the person being shot at can feel the percussion of the bullet when it passes him or her. Dep.

5

Middleton also explained that if Sawyer had fired two shots, there would have been a shell casing ejected from the rifle, but agreed that, if only one shot was fired, a shell casing would not necessarily have been contemporaneously ejected from the rifle.[3]

Dep. Middleton and other officers unsuccessfully searched for a shell casing at the scene. He explained that this was difficult because of all of the debris around the house and yard. Also, he was warned by a neighbor that Sawyer had placed "booby traps" around the property.[4]

After an initial search, due to the possible presence of "booby traps," he and the other officers present decided to cease searching. Dep. Middleton pointed out that several minutes had passed between when the shots were fired and when officers arrived on the scene, enough time for Sawyer to hide the firearm. Also, there was a cesspool on the property, but it was not searched. Neither were the woods or the pasture near Sawyer's residence.

Dep. Middleton later returned to the property with a search warrant, and searched inside Sawyer's shed, but was unable to find anything. The investigation did not locate where the bullet had struck, and no projectile was recovered.

---

[3]Dep. Middleton testified that the British 303 is a "bolt action rifle," which requires that ammunition be loaded into a magazine attached to the bottom of the rifle; the rounds are then loaded into the rifle by means of sliding the bolt. The bolt is then latched down, locking it into place, and then the trigger can be pulled to fire the rifle, at which point the bullet comes out along with percussion and gunshot residue. In order to get another bullet into the chamber of the rifle, the bolt must be "unlocked" and the process repeated, at which point the spent casing, or "hull," from the first round fired would be ejected from the gun.

[4] Dep. Middleton determined that the shot was fired approximately 15 yards from Sawyer's front door. Ms. Jesslink had a cyclone fence around her house. The state admitted several photographs depicting the outside of Sawyer's residence abutting Ms. Jesslink's fence. The photographs depict a lot of debris around Sawyer's residence and a water hose near the fence surrounding Ms. Jesslink's residence.

Dep. Middleton conducted a presumptive gunshot residue test on Sawyer's right hand, right shoulder and the right side of Sawyer's face. The gunshot residue test was presumptive and not definitive, meaning other substances could have read as positive other than gunshot residue. The test registered as presumptively positive for gunshot residue on all three places tested. Dep. Middleton admitted that it was possible for a person to get gunshot residue on their person by being in the area when someone else fired a weapon.

On cross-examination, Dep. Middleton testified that it was approximately 15 minutes between when he received the call of shots fired to when he arrived at Ms. Jesslink's residence. He was one of the first officers on the scene, and that Ms. Jesslink informed him that she had an argument with Sawyer over the garden hose, and that the garden hose had been a source of previous arguments between Ms. Jesslink and Sawyer. The account that Ms. Jesslink gave Dep. Middleton when he arrived on the scene was consistent with her testimony at trial.

Dep. Middleton testified that the ammunition found on Sawyer's property could only be fired by a British Lee-Enfield 303 rifle, and that he was unaware of any other brand of firearm that fired that ammunition. Dep. Middleton testified that the 303 Lee-Enfield has a fairly distinctive shape because of the forward magazine from the trigger, and that no comparisons were made to see if that type of weapon would fit in the gun case found at the scene.

**Kenneth Armstrong's testimony**

Mr. Armstrong is retired and lives at 492 Albert Smith Road, in Union Parish. He knows both Sawyer and Ms. Jesslink; at the time of trial, he had

known Sawyer for about 40 years. Mr. Armstrong testified that he has arthritis and uses a cane when he walks, and has a workshop behind his residence. The workshop is about 50 yards from Ms. Jesslink's house.

Mr. Armstrong was in his workshop cleaning mechanical parts with gasoline around 1:00 p.m. on the date of the offense. At that point, he heard Sawyer hollering; Sawyer's voice was coming from the direction of Ms. Jesslink's house and Sawyer's shed. Roughly a minute or two after Sawyer stopped hollering, Mr. Armstrong heard the shot of the high-powered rifle coming from the same direction as Sawyer's hollering a moment earlier.

About two minutes after the shot, Mr. Armstrong got a call from Ms. Jesslink. He testified that she sounded excited and scared, and that she was crying. Mr. Armstrong stated that Ms. Jesslink told him Sawyer had just shot at her and she asked, in so many words, that Mr. Armstrong come and protect her.

Mr. Armstrong walked to his house, got his pistol and holster, went out the front door and got on his four-wheeler, and just as he got to the road (about 20 minutes after Ms. Jesslink's call), the police arrived.

It was not typical for Mr. Armstrong to take his gun when visiting with Ms. Jesslink or Saywer, but he did so that day, "Cause he had done fired at her." He testified that the path he took to get on his four-wheeler was about one hundred feet, but that he moved slower than most people due to his mobility limitations. Mr. Armstrong stated that, upon seeing the police, he backed his four-wheeler up into his yard, and subsequently spoke to police and told them about hearing Sawyer yelling and the gunshot.

Mr. Armstrong unequivocally described the gunshot as that of a high-powered rifle, and stated that he hunts and owns several guns, including a

8

Remington 303 rifle, and that he can tell the difference between the sound from a high-powered rifle and other types of firearms. Upon hearing the shot, Mr. Armstrong thought Sawyer shot his British 303, which Mr. Armstrong described as "an old military style gun [that had] been converted…to a hunting gun."

Mr. Armstrong testified that Sawyer brought the British 303 to his house several years prior to have Mr. Armstrong fix the sight on it.[5] Sawyer brought the gun to him around October 2016, before hunting season, claiming the gun shot to the left of target. Mr. Armstrong stated that the gun was not pulling to the left when he fired it, but, rather, it was Sawyer who was not shooting straight. The state produced a photograph of a 303 British bolt action rifle, and Mr. Armstrong affirmed that it was the same type of gun Sawyer had him shoot in October 2016, but that Sawyer's gun had a different sight on it.

On cross-examination, Mr. Armstrong stated that he always got along with Sawyer, and he called Ms. Jesslink a "friend." Mr. Armstrong stated that on the day of the offense, he only heard one person, Sawyer, yelling before he heard the shot. He also stated that it was not unusual to hear gunfire from hunting or target practice in that area. He stated, "All my neighbors hunt. They practice all the time." However, he had not heard any other shots on the date of the offense prior to the subject shot.

Mr. Armstrong informed police that there were "booby traps" at Sawyer's property. He elaborated that Sawyer had previously brought a steel trap to his house and used his welding machine in order to weld "little

---

[5] Mr. Armstrong described Sawyer's gun to police as a 303 bolt action rifle, with a rusted blue finish and a dark walnut stock.

spikes" onto the trap in hopes of catching someone who had been stealing from his yard.

On August 1, 2019, a unanimous jury found Sawyer guilty of attempted second degree murder. Sawyer filed motions for post-verdict judgment of acquittal and for new trial. On August 27, 2019, the trial court denied both motions.

Sawyer now appeals. He makes the following assignments of error: (1) the evidence was insufficient to support his conviction for attempted second degree murder because it failed to prove beyond a reasonable doubt that he had specific intent to kill; and (2) alternatively, if he did have specific intent to kill, the court should reduce his conviction to attempted manslaughter because the evidence preponderates in favor of a finding that he acted in sudden heat of passion caused by Ms. Jesslink's provoking him.

**DISCUSSION**

Sawyer's sole assignment of error is that the evidence is insufficient to support his conviction for attempted second degree murder. In support, Sawyer argues that he lacked the requisite specific intent to kill Ms. Jesslink, even if he fired one shot in her direction. Sawyer argues that if he did possess the requisite specific intent, he is guilty, at most, of attempted manslaughter. However, Sawyer argues, because he had no specific intent to kill his sister, the only possible responsive verdict is aggravated assault with a firearm. Accordingly, Sawyer asks this Court to reverse his conviction or reduce it to aggravated assault with a firearm.

Alternatively, Sawyer asks this Court to modify the verdict pursuant to La. C. Cr. P. art. 821(E), and render a judgment of attempted manslaughter.

10

**Law**

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Lynn*, 53,189 (La. App. 2 Cir. 1/15/20), 288 So. 3d 881. This standard, now legislatively embodied in La. C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797.

The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Dale*, 50,195 (La. App. 2 Cir. 11/18/15), 180 So. 3d 528, *writ denied*, 15-2291 (La. 4/4/16), 190 So. 3d 1203. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *State v. Steines*, *supra*.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. To sustain a conviction, the facts established by the evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant

11

was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Lynn, supra*; *State v. Steines*, *supra*.

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 17-1894 (La. 6/1/18), 243 So. 3d 1064.

To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; La. R.S. 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1, attempted second degree murder requires specific intent to kill. *State v. Harris*, 52,541 (La. App. 2 Cir. 2/27/19), 266 So. 3d 953, 956–57, *writ denied*, 19-611 (La. 9/17/19); *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434. Proof of specific intent to inflict great bodily harm is insufficient for a conviction for attempted second degree murder. *State v. Lynn, supra*; *State v. Lewis*, 51,672 (La. App. 2 Cir. 11/15/17), 245 So. 3d 233; *State v. Patterson*, 50,305 (La. App. 2 Cir. 11/18/15), 184 So. 3d 739, *writ denied*, 15-2333 (La. 3/24/16), 190 So. 3d 1190.

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. *State v. Harris, supra*; *State v. Murray*, 49,418 (La. App. 2 Cir. 1/14/15), 161 So. 3d 918, *writ denied*,

12

2015-0379 (La. 4/8/16), 191 So. 3d 582. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop, supra.* The determination of whether the requisite intent is present is a question for the trier of fact. *State v. Lynn, supra*; *State v. Harris, supra.*

Manslaughter is defined in La. R.S.14:31(A)(1) as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

Manslaughter as so defined is a lesser included offense of second degree murder. *State v. Lombard*, 486 So. 2d 106 (La. 1986). La. C. Cr. P. art. 821(E) provides:

> If the appellate court finds that the evidence, viewed in the light most favorable to the State, supports only a conviction of a lesser included responsive offense, the appellate court, in lieu of granting a post judgment verdict of acquittal, may modify the verdict and render judgment of conviction on the lesser included responsive offense.

In *Lombard, supra,* the Louisiana Supreme Court reduced the defendant's conviction for second degree murder to manslaughter under La. R.S.14: 31(A)(1). Lombard fatally stabbed a person who was in the act of violently attacking him, *i.e.*, had just punched him and slammed him into a railing, and had him in a chokehold with one of his arms pinned behind his back at the time of the stabbing. In so holding, the court stated that there was a clear preponderance of the evidence establishing the elements of manslaughter under La. R.S.14:31(A)(1).

13

In *State v. Arabie*, 496 So. 2d 554 (La. App. 1 Cir. 1986), the trial judge reduced the defendant's conviction to manslaughter pursuant to La. R.S. 14: 31(A)(1) and La. C. Cr. P. art. 821. The First Circuit, in reversing the trial court and reinstating the second degree murder conviction, framed its analysis thusly:

> In reviewing the trial court's modification of the instant jury verdict, this court must determine whether or not a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence.

*Id*. at 557.

## Analysis

### Sufficiency of the evidence

Sawyer's argument that the evidence did not sufficiently prove that he specifically intended to kill Ms. Jesslink is meritless. Ms. Jesslink testified that Sawyer said he "had something for her," pulled a rifle out, put it to his shoulder, aimed it at her face and fired at the same time that she ducked down. Ms. Jesslink also testified that she saw the barrel of the gun aimed at her and "felt" the shot, meaning she felt the percussion from the gun and the bullet going by her. Dep. Middleton testified that Sawyer had presumptive gunshot residue on his face, hand, and shoulder. Dep. Middleton's testimony regarding the facts Ms. Jesslink reported to him corroborated her testimony. Furthermore, Mr. Armstrong corroborated Ms. Jesslink's account of the incident, and testified that Sawyer had a British 303 rifle. Law enforcement seized ammunition for a 303 rifle and a gun case from Sawyer's residence. In fact, these were found under the red poncho that Ms.

Jesslink described as the place from where Sawyer pulled the rifle he aimed at her.

The testimony of all three witnesses was consistent, and Ms. Jesslink unequivocally stated that her brother aimed the rifle directly at her face and fired all in the same moment.

The evidence is sufficient to support Sawyer's conviction of attempted second degree murder. This assignment of error lacks merit.

## Attempted manslaughter

Ms. Jesslink's mere words to Sawyer simply do not rise to the level necessary to establish provocation under La. R.S. 14:31(A)(1). That is so because "mere words…no matter how insulting, will not reduce a homicide from murder to manslaughter." *State v. Mitchell*, 39, 202 (La. App. 2 Cir. 12/15/04) 889 So. 2d 1257, *writ denied,* 05-0132 (La. 4/29/05), 901 So. 2d 1063.

Furthermore, even if mere words theoretically could be sufficient, Sawyer's argument would still fail. That is because, viewing the light most favorable to the prosecution, a rational juror could nonetheless have concluded that the evidence did not preponderate in favor of a finding that the average person would have been deprived of his self-control and cool reflection by Ms. Jesslink's words.

## CONCLUSION

For the foregoing reasons, Sawyer's conviction and sentence are affirmed.

**AFFIRMED.**

15